*PRECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0443p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————

KYLE KEETON,

*Plaintiff-Appellee,*

No. 04-6023

*v.*

FLYING J, INC.,

*Defendant-Appellant.*

—————————

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 02-00269—J. Gregory Wehrman, Magistrate Judge.

Argued: September 15, 2005

Decided and Filed: November 17, 2005

Before: GUY, BATCHELDER, and GILMAN, Circuit Judges.

—————————

**COUNSEL**

**ARGUED:** Robert B. Worley, Jr., JONES, WALKER, WAECHTER, POITEVENT, CARRETE & DENEGRE, New Orleans, Louisiana, for Appellant. R. Gary Winters, McCASLIN, IMBUS & McCASLIN, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Robert B. Worley, Jr., Shelley M. Sullivan, JONES, WALKER, WAECHTER, POITEVENT, CARRETE & DENEGRE, New Orleans, Louisiana, for Appellant. R. Gary Winters, McCASLIN, IMBUS & McCASLIN, Cincinnati, Ohio, for Appellee.

GUY, J., delivered the opinion of the court, in which BATCHELDER, J., joined. GILMAN, J. (pp. 6-13), delivered a separate dissenting opinion.

—————————

**OPINION**

—————————

RALPH B. GUY, JR. In this sexual harassment case, defendant Flying J, Inc. appeals from a jury verdict finding it liable for supervisory sexual harassment resulting in a tangible employment action. Flying J argues that there was no tangible employment action when it fired but then re-hired plaintiff Kyle Keeton the same day and when it laterally transferred Keeton to a different location. For the reasons explained below, we conclude that the termination was not a tangible employment action but that a reasonable jury could have decided that the transfer was a tangible employment action. Accordingly, we **AFFIRM**.

## I.

Flying J operates travel plazas that cater to interstate travelers. Each plaza has a restaurant. Kyle Keeton applied to be an assistant restaurant manager at a Flying J plaza. On his employment application, he stated that he was willing to relocate to other Flying J travel plazas. Keeton agreed because he believed that relocation would increase his chances for advancement. Keeton lived in Georgia when Flying J hired him, but he agreed to relocate to Tennessee for training.

After he completed his training in June of 2001, Flying J assigned Keeton to work as an associate manager at the Walton, Kentucky plaza. Flying J orally committed to keep Keeton at the Walton store for five years. Judy Harrell was the General Manager and his immediate supervisor. In September, Harrell began making several sexual advances toward Keeton, which he rejected.

Even though Keeton was not scheduled to work on December 4, 2001, Harrell called him at home and asked him to come to the restaurant so that she could speak to him in person. When Keeton arrived at the restaurant, Harrell told him that he was fired, explaining, "you're not supporting me." Prior to this meeting, Harrell had never disciplined Keeton formally or informally, had not criticized him at all during management meetings, and Keeton had no warning that his job was in jeopardy. After the meeting, an assistant manager escorted Keeton from the building.

Keeton returned home and phoned Jamal Abdalla. Abdalla had been the manager of the district encompassing Walton when Keeton was hired, but in December of 2001 Abdalla was the district manager of another district that included Cannonsburg, Kentucky, a town 120 miles away from Walton. Keeton told Abdalla about the termination and that he thought it resulted from sexual harassment. Abdalla called Keeton back about one-and-a-half hours later and told him that he could maintain his position as associate manager if he transferred to Cannonsburg. Later that same day, his termination was formally changed to a two-week suspension, then a one-week suspension, then "to however fast [Keeton] could get over to Cannonsburg." Abdalla told him that he was being "reinstated." It took Keeton one week to move to Cannonsburg, and he was paid for that week. Keeton maintained the same title, responsibilities, salary, and benefits in Cannonsburg that he had in Walton. Keeton's wife could not move with him to Cannonsburg because of a debilitating back problem that resulted in serious surgery. While he was working in Cannonsburg, Keeton maintained two residences—one for himself and one for his wife. Keeton worked at the Cannonsburg Flying J restaurant until mid-January, when he left for a position with another restaurant chain.

Keeton filed this lawsuit against Flying J for sexual harassment, retaliation, and constructive discharge under Title VII and Kentucky Revised Statute Chapter 344. Keeton alleges that he suffered from sexual harassment resulting in a tangible employment action, or alternatively that he suffered from sexual harassment resulting in a hostile work environment. The district court rejected Flying J's motion for summary judgment. The parties then consented to the jurisdiction of a magistrate judge for the jury trial. Flying J moved for judgment as a matter of law after Keeton presented his case to the jury and again after it presented its defense, but the magistrate judge denied the motions.

The jury found Flying J liable only for sexual harassment resulting in a tangible employment action. Following the format of the verdict form, the jury did not answer the interrogatory regarding sexual harassment with no tangible employment action. The jury answered "no" to the interrogatories asking if Flying J was liable for retaliation or if Keeton was constructively discharged. The jury awarded Keeton $15,000 in compensatory damages for emotional suffering, but with no back pay. Flying J renewed its motion for judgment as a matter of law on the grounds that Keeton had failed to produce evidence that he suffered a tangible employment action, but the court again denied the motion. Pursuant to 42 U.S.C. § 2000e-5, the trial court awarded Keeton attorney fees and costs of $36,573.86 as the prevailing party.

## II.

We review *de novo* a district court's denial of judgment as a matter of law. *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 794 (6th Cir. 2004) (en banc), *petition for cert. filed*, (U.S. Aug. 24, 2005) (No. 05-259). "In determining whether a motion should have been granted, we must review the entire record, we 'must draw all reasonable inferences in favor of the nonmoving party, and [we] may not make credibility determinations or weigh the evidence.'" *McCombs v. Meijer, Inc.*, 395 F.3d 346, 352 (6th Cir. 2005) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, (2000)). Judgment as a matter of law is appropriate where "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." FED. R. CIV. P. 50(a)(1).

Sexual harassment claims under the Kentucky Civil Rights Act and Title VII are analyzed in the same manner. *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 347 (6th Cir. 2005). An employer's liability for supervisory sexual harassment depends on the consequences of the supervisor's actions. If proven sexual harassment by the supervisor did not result in a tangible employment action, then the employer may not be liable if it engaged in preventative or corrective measures and the plaintiff unreasonably failed to utilize the measures the employer provided. *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). If the sexual harassment did result in a tangible employment action, the employer will be strictly liable for the supervisor's sexual harassment. *Ellerth*, 524 U.S. at 762-63; *Clark*, 400 F.3d at 349 n.1. "When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII." *Ellerth*, 524 U.S. at 753-54. The *Ellerth* court defined a tangible employment action as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id*. at 761. Accordingly, we have stated that an employment action must be materially adverse for an employer to be strictly liable for sexual harassment. *Kocsis v. Multi-Care Mgmt. Inc.*, 97 F.3d 876, 886 (6th Cir. 1996).[1]

The jury found that Harrell sexually harassed Keeton and that the harassment resulted in a tangible employment action. Flying J argues on appeal that the termination was not a tangible employment action because it was too temporary, and that the transfer was not a tangible employment action because it was lateral.

## A.    The Termination

We have decided that when an employer imposes an employment action that would be an adverse employment action but then quickly reverses the action, the employee has not suffered an adverse employment action. *Birch v. Cuyahoga County Probate Court*, 392 F.3d 151 (6th Cir. 2004); *Bowman v. Shawnee State Univ.*, 220 F.3d 456 (6th Cir. 2000). In *Birch*, a probate court magistrate sued for race and sex discrimination under Title VII and the Ohio civil rights statute. At a meeting with the presiding judge after she complained about unequal pay, the presiding judge told her that he would not like her to be a magistrate any longer. *Birch*, 392 F.3d. at 156. When the plaintiff asked if she was being fired, the judge told her that she was not. *Id*. The plaintiff argued that his comment was a termination and that it was an adverse employment action under Title VII. *Id*. at 169. We concluded that the presiding judge's remarks did not amount to an adverse action because, even if she was terminated for a moment, there was no real change in her employment status. *Id*.

---

[1]The terms "tangible employment action" and "adverse employment action" are interchangeable. *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 461 n.5 (6th Cir. 2000).

Likewise, in *Bowman* we determined that a temporary removal of responsibilities was not an adverse action. There, the plaintiff had been an instructor and the Coordinator of Sports Studies at a university, and he alleged that his supervisor, a woman, sexually harassed him, ultimately resulting in her removing him as Coordinator. 220 F.3d at 459-60. Ten days later, he was restored to his previous position and the termination letter was removed from his file. *Id.* We held that "[e]ven if we assume that the loss of the Coordinator position constitutes a significant change in employment status, there is no tangible employment action in this case because the very temporary nature of the employment action in question makes it a non-materially adverse employment action." *Id.* at 462. Other courts have also held that when an otherwise adverse employment action is rescinded before the employee suffers a tangible harm, the employee has not suffered an adverse employment action. *See Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001) (and cases collected therein). Therefore, the only reasonable conclusion the jury could have reached in this case is that Keeton's termination lasting only hours was not a tangible employment action.

## B.     The Transfer

Flying J maintains that a transfer without a change in status, benefits, or salary is not a tangible employment action. We have held that "reassignments without salary or work hour changes do not *ordinarily* constitute adverse employment decisions in employment discrimination claims." *Kocsis*, 97 F.3d at 885 (emphasis added). In *Kocsis*, a nursing supervisor was reassigned as a unit nurse. There was no evidence that the new position held less prestige, earned a lower salary, demanded worse hours, or entitled her to any difference in employment related benefits of any kind. *Id.* at 886-87. Therefore, we concluded that the reassignment was not an adverse action. *Id.* In *White*, a female railroad employee sued her employer for sex discrimination. After she had complained about sexual harassment committed by her immediate supervisor, she was removed from her forklift position and reassigned to a track laborer position. 364 F.3d at 792. Her pay and benefits were the same, but the job was dirtier, more labor intensive, more difficult, required fewer qualifications, and was considered a worse job by the other employees. *Id.* at 793. We concluded that even though there was no loss in salary or benefits, the factors listed above were unique to the plaintiff's situation and rendered the transfer a demotion. *Id.* at 803.

In this case, Keeton's responsibilities in Cannonsburg were not different from his responsibilities in Walton. The only difference between the two positions was location, and Keeton did not present any evidence that Cannonsburg was objectively a worse location than Walton. Cannonsburg was, however, a substantial distance from Walton. Defendant correctly points out that *Koscis* and *White* focus on the differences in job duties and not other impacts on the employee. We have not precluded consideration of such factors as commuting distance or relocation, however. In *Policastro v. Northwest Airlines, Inc.*, 297 F.3d 535 (6th Cir. 2002), we explicitly stated that increased distance to a work site can amount to a constructive discharge. There, the plaintiff was a sales agent living in the Cincinnati area. *Id.* at 537. Her sales territory included Louisville and Lexington, Kentucky, which were one hundred miles and eighty miles, respectively, from her home. *Id.* The Louisville/Lexington region comprised about forty percent of her sales, and she was required to be physically in the Louisville/Lexington region four to six days per month. *Id.* She was assigned to work the Louisville/Lexington areas exclusively following a corporate restructuring, and she was expected to be physically present there four days per week. *Id.* She was not required to relocate and chose not to, commuting instead and spending three nights per week in Kentucky. *Id.* She did not experience any change in salary, benefits, diminution in responsibilities, or a modification of her title, and the reassignment was expected to advance her career. *Id.* at 539. She was unhappy with the change and resigned about ten months later. *Id.* at 538. She sued her employer for sex and age discrimination, claiming that the reassignment amounted to a constructive discharge. *Id.*

We held that the reassignment was not objectively intolerable and therefore was not a constructive discharge because "[t]he only aspect of her job that changed was that she was required

to spend her time solely in Kentucky rather than splitting her time with the Cincinnati market. The distance Policastro had to travel did not increase, although the number of times per month that she had to travel that distance did." *Id*. at 539. Flying J places importance on our statement that "[a]n employee's subjective impressions as to the desirability of one position over another are not relevant" to the decision of whether an employee was constructively discharged. *Id*. Flying J maintains that a dislike of a long commute or relocation is an example of the subjective desirability of a position to the employee and we therefore should disregard Keeton's dislike of his new location. The very next sentence after the one quoted directly above, however, is: "We note that increased distance from home to a new position is a factor in determining whether a constructive discharge has occurred." *Id*. If dislike of increased commute or relocation for a new position merely represents the subjective taste of the employee, then we would not have expressly stated that increased distance is a relevant consideration. We have also considered commute distance in other decisions. In *Akers v. Alvey*, 338 F.3d 491 (6th Cir. 2003), a state employee who complained about sexual harassment was transferred to a different county's office. We decided that the transfer was not an adverse employment action because there was no significant change in her pay or duties, and "the transfer actually reduced Aker's round[-]trip commute from her home by 60 miles per day." *Id*. at 498. We have also affirmed an Eastern District of Kentucky decision that held in the constructive discharge context, a lateral transfer with an added twenty minutes of commute time did not constitute a constructive discharge. *Darnell v. Campbell County Fiscal Court*, 731 F. Supp. 1309 (E.D. Ky. 1990), *aff'd*, 924 F.2d 1057 (6th Cir. 1991). The district court admitted that "transfer over a great distance can amount to a constructive discharge." *Id*. at 1313, citing *Christensen v. Equitable Life Assurance Soc'y*, 767 F.2d 340, 343 (7th Cir. 1985). Although much of our case law focuses on transfers in the context of the plaintiff's effort to demonstrate a constructive discharge, we have not precluded the possibility that a transfer not rising to the level of a constructive discharge might nonetheless constitute a tangible employment action. *See Hollins v. Atl. Co.*, 188 F.3d 652, 662 (6th Cir. 1999) (noting that "other indices that might be unique to a particular situation" can turn what would ordinarily not be an adverse employment action into one). While this jury found that Keeton was not constructively discharged, it could reasonably have found that Keeton's transfer, which increased his commute to the extent that he needed to consider relocation, was an adverse employment action.[2]

Flying J also argues that the transfer could not have been an adverse employment action for two additional reasons: Keeton had agreed to relocate on his employment application, and Keeton did not seek damages incurred by the transfer. Keeton's employment application does not negate the transfer's impact on Keeton because when he agreed to be transferred, he did so with the understanding that a transfer would be for advancement within the company and not as a result of unlawful sexual harassment. Moreover, defendant's position that Keeton did not seek damages because of the transfer is disingenuous. It is based on Keeton's trial testimony during cross-examination in response to the following question: "And you're not claiming any damages, money damages, in this case because you were moved from Walton within five years now, are you?" Keeton answered "no." The question inquired as to whether Keeton was pursuing a claim for defendant's failure to honor its oral commitment to keep Keeton in Walton for five years, not whether Keeton incurred any damages because of the transfer. Flying J's only ground for reversal was that the jury improperly found a tangible employment action. Having determined that the jury could have reasonably concluded that Keeton suffered an adverse employment action, we **AFFIRM**.

---

[2]Because of the nature of the argument offered in the dissent, it is important to emphasize that we are not holding that a lengthy or even burdensome commute is, *per se*, an adverse employment action. We merely hold that here, it was an appropriate factor for the jury to consider given the particular facts of this case.

———————————

**DISSENT**

———————————

RONALD LEE GILMAN, Circuit Judge, dissenting. Just last year, in *White v. Burlington Northern & Santa Fe Railway Co.*, 364 F.3d 789, 791 (6th Cir. 2004) (en banc), this court granted a rehearing en banc to clarify the proper inquiry for determining whether the victim of alleged discriminatory conduct has suffered an adverse employment action. The comprehensive opinion traced the history of the adverse-employment-action requirement, rejected a definition proposed by the EEOC and adopted by the Ninth Circuit, and instead reaffirmed a definition that this court had previously utilized. *Id.* at 795-800. Under that definition, a plaintiff seeking relief under Title VII must demonstrate "a materially adverse change in the terms of her employment." *Id.* at 797 (citations omitted).

I believe that the majority has now muddied the waters that *White* had clarified, swayed by Keeton's sympathetic family situation and isolated dicta from cases whose actual holdings contradict the conclusion that the majority reaches. Having injected Keeton's particular personal circumstances into the adverse-employment-action analysis, the majority takes up an argument that Keeton himself had abandoned and proceeds to hold what no court in or outside of this circuit ever has: that a purely lateral transfer that carries with it no change in salary, benefits, responsibilities, or prestige is an adverse employment action when undertaken as a solution to a supervisor's discriminatory conduct. Because I believe that *White* and the caselaw leading up to it call for a result contrary to the one reached by the majority today, I would reverse the decision below and remand the case to the district court with instructions to grant judgment as a matter of law in favor of Flying J. I therefore respectfully dissent.

## I. TERMINATION AND IMMEDIATE REINSTATEMENT

I agree with the majority that an employee who is illegally discharged, but who secures immediate reinstatement without the loss of any benefits, has not suffered an "adverse employment action" for purposes of the federal anti-discrimination laws. Maj. Op. at 3-4. Starting with the decision in *Kauffman v. Allied Signal, Inc.*, 970 F.2d 178, 187 (6th Cir. 1992), this court has recognized a de minimis exception to the general rule that an adverse employment action following discriminatory conduct gives rise to employer liability under Title VII. The plaintiff in *Kauffman* was a female machine operator who took medical leave to undergo breast enhancement surgery, and who was harassed by her male supervisor upon returning to work. When she told her supervisor that she had had "enough" of his overtures, he briefly assigned her to a manual machine that was difficult to operate and that was called "torture" by other employees. This court rejected the company's argument that an adverse employment action must be economic in nature, but remanded the case to the district court because the one-day transfer might fall into "a *de minimis* exception for temporary actions, such as . . . where further remedial action is moot and no economic loss occurred." *Id.* at 187.

Our decision in *Bowman v. Shawnee State University*, 220 F.3d 456, 462 (6th Cir. 2000), on which the majority properly relies, is an on-point application of the principle first articulated in *Kaufmann*. The plaintiff in *Bowman* was the Coordinator of Sports Studies at a university, and he claimed that a female dean had stripped him of his duties as Coordinator after he resisted her sexual advances. Ten days after the dean's actions, however, the school provost rescinded the dean's decision and removed the termination letter from Bowman's personnel file. This court held that the ten-day removal from the Coordinator position, with no loss in salary or benefits, was "properly characterized as a de minimis employment action that does not rise to the level of a materially adverse employment decision." *Id.* Although the loss of Coordinator responsibilities might be

"materially adverse if permanent," the court said that the "very temporary" nature of the action placed it within the de minimis exception carved out by *Kauffman*.  220 F.3d at 462.

The majority, therefore, correctly concludes that *Bowman* disposes of Keeton's argument that a temporary termination, even if followed by immediate reinstatement, comprises an adverse employment action.  Our unanimous conclusion on this point should, in my opinion, end our review of the present case because the "termination theory" of liability is the only one that Keeton advanced in his appellate brief.  *See Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 311 (6th Cir. 2005) (stating the general rule that "failure to raise an argument in [an] appellate brief constitutes a waiver of the argument on appeal") (citation omitted).

But instead of deciding the present case on "the best and narrowest ground available," *Air Courier Conference v. American Postal Workers Union*, 498 U.S. 517, 531 (1991) (Stevens, J., concurring in the judgment), the majority reaches out and affirms the jury verdict on the basis of a theory that even Keeton does not defend.  This theory of liability—that a purely lateral transfer can constitute an adverse employment action when undertaken as a solution to a supervisor's unlawful conduct—departs from existing caselaw and the policies underlying Title VII.

## II.  LATERAL TRANSFER

I begin with this court's recent en banc decision in *White*, where the court reaffirmed that, "[i]n this circuit, *Kocsis* [97 F.3d 876 (6th Cir. 1996] is the seminal case for defining [an] adverse employment action."  *White*, 364 F.3d at 797.  The Supreme Court relied in part on *Kocsis* in describing an adverse (or tangible) employment action as "a significant change in *employment status*, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Id.* at 798 (citing *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998) (emphasis added)).

*Kocsis* provides guidance beyond the Supreme Court's brief description in *Burlington Industries*.  The *Kocsis* court looked to cases from the Seventh Circuit and joined that circuit in concluding that victims of prohibited discrimination must prove that they have "suffered a *materially adverse* change in the terms or conditions of [their] employment because of [their] employer's conduct."  *Koscis*, 97 F.3d at 885 (citing *Spring v. Sheboygan Area Sch. Dist.*, 865 F.2d 883, 885 (7th Cir. 1989)) (emphasis in original).  Although outright termination is a "materially adverse change," reassignments without salary or schedule changes do not constitute adverse employment actions unless they carry with them "a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation."  *Koscis*, 97 F.3d at 886 (citing *Crady v. Liberty Nat'l Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)).  These business decisions "may" be adverse employment actions, *White*, 364 F.3d at 797, but only if they are "more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Kocsis*, 97 F.3d at 886 (citing *Crady*, 993 F.2d at 136).

The *Kocsis* court borrowed extensively from the Seventh Circuit's decision in *Spring*.  There, a school principal was transferred to a new position farther away from her home.  She sued the school board under the Age Discrimination in Employment Act (ADEA), alleging that she had been transferred on account of her age.  *Spring*, 865 F.2d at 885-86.  Observing that "the only negative aspect of Spring's new job assignment was that she would have to travel farther from home to get to work," *id.* at 886, the Seventh Circuit held that Spring had not suffered an adverse employment action.  Increased commute time alone did not suffice to show a "materially adverse change in the terms and conditions of [Spring's] employment."  *Id.*

Another ADEA case in the educational area makes the same point.  In *Sanchez v. Denver Public Schools*, 164 F.3d 527 (10th Cir. 1998), a longtime school teacher was transferred to a

different elementary school when enrollment at her current school declined. The location of the new school increased Sanchez's commute time from between five and seven minutes to between thirty and forty minutes. *Id.* at 532. Sanchez sued the school district under Title VII and the ADEA, alleging that she had been transferred because of her age and her gender. In affirming the grant of summary judgment in favor of the school district, the Tenth Circuit emphasized that Sanchez's "salary and benefits remained the same," that she retained the same job and responsibilities, and that neither the increased commute time nor other "special circumstances" demonstrated that "this employment action was anything beyond a mere inconvenience or alteration of responsibilities." *Id.*

Similarly, the 120-mile transfer in the present case did not alter the terms or conditions of Keeton's employment at Flying J. He retained his status and responsibilities as an assistant manager and continued to enjoy the same salary and benefits that he had received prior to the transfer. The new job was, as the magistrate judge described it, "virtually identical to his [previous] position in Walton, Kentucky." Because the transfer left Keeton's "employment status" unaltered, *Burlington Industries*, 542 U.S. at 761, he simply did not suffer an adverse employment action.

What must drive the majority's contrary conclusion, then, is one of two theories, both of which are unsupported by existing law. One theory rests on the fact that the distance of Keeton's transfer was greater than that of the transfers in cases like *Spring* and *Sanchez*, cases the majority does not even cite. The second theory stems from the majority's apparent belief that Flying J's solution to the discriminatory conduct of Keeton's supervisor, combined with Keeton's own personal circumstances, convert an otherwise permissible employment decision into an adverse one. These two theories will be addressed in turn.

## A.    A longer commute does not constitute a material change in the terms or conditions of employment

First, the principle that the majority appears to adopt—that employment decisions increasing commute time can, in and of themselves, be materially adverse if undertaken as a solution to a supervisor's discriminatory conduct—has little basis in our caselaw. As the majority acknowledges, none of our cases has ever found that increased commute time, standing alone, transforms an otherwise lawful lateral transfer into an adverse employment action.

This court, for example, affirmed a district court opinion holding that an increase of 20 minutes in commute time amounted to neither a constructive discharge nor an adverse employment action. *Darnell v. Campbell County Fiscal Court*, 731 F. Supp. 1309, 1313 (E.D. Ky. 1990), *aff'd*, 924 F.2d 1057 (6th Cir. 1991) (unpublished). More recently, in *Policastro v. Northwest Airlines, Inc.*, 297 F.3d 535, 539 (6th Cir. 2002), this court rejected a plaintiff's claim that she suffered an adverse employment action when her employer required her to travel to cities 80 and 100 miles from her home four days per week, instead of four days per month. The *Policastro* court refused to rely on the plaintiff's "subjective displeasure" over the airline's business decisions, instead concluding that the increased travel time each month did not render the terms or conditions of her employment "objectively intolerable." *Id.*

Two unpublished cases from this circuit add to the steady stream of authorities holding that increased travel time is insufficient to render a transfer an adverse employment action. One is *Nelson v. General Electric Company*, No. 99-4043, 2 F. App'x 425, 432-33 (6th Cir. Jan. 17, 2001) (unpublished), where the company was reducing its staff at one facility and offered the plaintiff a position at another. The new position would have required her to commute 60 miles to work each day. This court held "that a longer commute with the same job title, salary, and benefits is not an adverse employment action." *Id.* at 433. In the other case, an interviewer at a public defender's office in Ohio was transferred from the adult division to the juvenile division, requiring her to spend additional time driving between county buildings. *Smith v. County of Hamilton*, No. 00-4290, 34 F.

App'x 450, 455-56 (6th Cir. April 19, 2002) (unpublished). This court again relied on *Darnell* and held that the increased travel time did "not amount to a materially adverse change." *Id.* at 456.

Beyond lacking support in the caselaw, the majority's disposition suffers from subjective line-drawing problems. This disposition is inconsistent with prior cases that examine the effect of an employment decision on a "reasonable person." *See Policastro*, 297 F.3d at 539. If a 20-minute increase in daily commute time, an extra 100 miles of driving on 12 additional days per month, and a 60-mile increase in a daily commute are not "objectively intolerable" changes in the terms and conditions of employment, what makes the 120-mile transfer in the present case an adverse employment action? *See Darnell*, 731 F. Supp. at 1313; *Policastro*, 297 F.3d at 538. And if the transfer had been to a location, say, 40 miles away, would the change in Keeton's employment status still be "materially adverse"? *Kocsis*, 97 F.3d at 885; *see Sanchez*, 164 F.3d at 532 (finding no adverse employment action despite a potential 35-minute increase in commuting time); *Spring*, 865 F.2d at 885 (finding no adverse employment action where increased travel time to work was the only negative consequence of an employee's transfer); *Nelson*, 2 F. App'x at 433 (holding that a 60-mile increase in commuting distance did not constitute an adverse employment action where the employee retained the same job title, salary, and benefits). When, in other words, would a reasonable person "need[] to consider relocation"? Maj. Op. at 5. The majority has not articulated answers to these questions.

In the face of the consistent and compelling authorities cited above, the majority relies on a single sentence in *Policastro* stating that courts can consider increased commuting distance as "*a* factor in determining whether a *constructive discharge* has occurred." Maj. Op. at 5 (citing *Policastro*, 297 F.3d at 539) (emphasis added). But the jury ruled *against* Keeton on his constructive discharge claim, so the only issue before us is whether Keeton suffered an adverse employment action. I therefore find the statement from *Policastro* on which the majority relies unpersuasive for two reasons. First, the majority has cited no authority for the proposition that something that is only one factor in the constructive-discharge inquiry can, in and of itself, constitute an adverse employment action. Second, even if that proposition had legal support, the jury whose verdict the majority affirms in the present case found that the transfer did *not* rise to the level of a constructive discharge. As a consequence, neither the holding in *Policastro* nor the principle that the majority extracts from that case supports the majority's conversion of one factor in the constructive-discharge analysis into the sole basis for finding an adverse employment action.

This is not to say that lateral geographic transfers can *never* amount to a constructive discharge and therefore satisfy the adverse-employment-action requirement. Assume, for example, a hypothetical case where the employer repeatedly ships its employee to different locations, ordering another transfer each time the employee settles in at the new location. A jury under such circumstances might reasonably conclude that the continuous transfers created an "objectively intolerable" working situation. But this hypothetical neither bolsters the majority's analysis nor helps Keeton, because his constructive-discharge theory was specifically rejected by the jury.

The majority next resorts to the general statement, made in yet another case finding no adverse employment action, that this transfer falls into the category of "other indices that might be unique to a particular situation." Maj. Op. at 5 (citing *Hollins v. Atl. Co.*, 188 F.3d 652, 662 (6th Cir. 1999)). But these "other indices," which this court also mentioned in *White*, 364 F.3d at 799, refer not to the plaintiff's personal or family situation, but instead to the "terms and conditions of employment." *Kocsis*, 97 F.3d at 886 (quoting *Spring*, 865 F.2d at 886). That much is clear from the context of this court's first use of the "other indices" language in *Kocsis*. *See* 97 F.3d at 886 (quoting *Crady*, 993 F.2d at 136).

In *Kocsis*, the quoted language appeared at the end of a list of employment actions short of termination that would nevertheless qualify as adverse. Because that list, like most, was not meant

to be exhaustive, the court added the category of "other indices . . . unique to a particular situation," a type of catch-all meant to include employment decisions that, although not universally recognized as negative, would likely be viewed as adverse by an employee in a particular setting. *See, e.g.*, *Molnar v. Booth*, 229 F.3d 593, 600 (7th Cir. 2000) (applying *Crady* and concluding that a school principal's act of taking away the supplies of an art teacher constituted an adverse employment action because the supplies were "necessary for her to be able to perform her assigned job").

What, then, are the "other indices" unique to Keeton's situation that convert an otherwise legitimate lateral transfer into an adverse employment action? The majority's discussion seems to turn on three factors: (1) that Keeton's transfer was a direct result of unlawful discriminatory conduct on the part of his supervisor; (2) that Keeton's wife suffered from a back problem that prevented her from accompanying him to Cannonsburg; and (3) that Keeton chose to maintain two residences, one in each town.

The first factor, however, is common to all cases brought under federal anti-discrimination laws. That is, all plaintiffs in sexual harassment suits brought under Title VII necessarily must allege that their employers subjected them to discrimination "because of" their sex. *See* 42 U.S.C. § 2000e-2a(1) (2000) (prohibiting discrimination "because of [an] individual's race, color, religion, sex, or national origin*); Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998) (observing the Title VII "is directed . . . at 'discriminat [ion] . . . because of . . . sex'") (citation omitted) (emphasis removed). The only distinction between the run-of-the-mill employment discrimination case and the present case is that Flying J, unlike most defendants, does not contest the charge that Keeton was harassed by his former supervisor.

But that distinction is really no difference at all, because a finding of no adverse employment action typically requires the court to assume the truth of the plaintiff's other allegations. *See, e.g. Kocsis*, 97 F.3d at 885 (assuming, in an ADA case, that the plaintiff was disabled when it held that she had not suffered an adverse employment action); *Sanchez*, 164 F.3d at 532 (resolving the adverse-employment-action inquiry without questioning the other aspects of the plaintiff's ADEA claim). The present case, in other words, is conceptually analogous to all anti-discrimination suits in so far as the employment decision that the plaintiff claims is adverse is allegedly a product of the defendant's discriminatory motives or behavior. Flying J's admission that Keeton was transferred as a solution to his supervisor's discriminatory conduct therefore does not obviate the need to conduct a wholly separate analysis as to the adversity of the transfer.

The other two factors certainly establish that the transfer was inconvenient to Keeton's personal life, but our cases make clear that "mere inconvenience" is not enough. Instead, the employer's decision must have a materially adverse effect on the terms and conditions of the person's employment. *Kocsis*, 97 F.3d at 886; *see also Haimovitz v. United States Dept. of Justice*, 720 F. Supp. 516, 526 (W.D. Penn. 1989) ("Although plaintiff may have concluded that such a relocation would adversely affect his personal life, the [anti-discrimination laws] only address[] those business decisions [that] adversely affect one's employment opportunities."). Indeed, if these second two factors are the true basis for finding Keeton's situation sufficiently "unique," one wonders whether the result would be different if Keeton were unmarried, or widowed, or if the household occupant suffering from serious physical problems were a parent, a child, or the family pet, instead of a spouse.

I believe that the majority's failure to provide any guidance beyond the facts of the present case is unsatisfactory because today's decision, if followed, will require employers to examine the personal characteristics and living situations of each affected employee before taking any action that might even marginally change that person's life. In essence, the majority reads the standard catch-all language of "other indices" as encompassing the collateral effects that employment decisions might have on the personal or family life of the affected employee. This reading, I fear, will force courts to depart from the settled ground of objective inquiry and instead require them to probe whether,

under the plaintiff's specific life circumstances, the employment decision could be viewed as materially adverse. Once again, caselaw and policy considerations counsel against importing this type of subjective test into a crucial step of our Title VII analysis.

**B.      A plaintiff's subjective preferences and characteristics should not be considered in the adverse-employment-action inquiry**

This court has consistently applied an objective standard in evaluating both the adverse-employment-action prong of the anti-discrimination laws and claims of constructive discharge. *See, e.g.*, *Strouss v. Mich. Dep't of Corr.*, 250 F.3d 336, 342 (6th Cir. 2001) (explaining that a lateral transfer could be an adverse employment action "if the conditions of the transfer would have been objectively intolerable to a reasonable person") (internal citation omitted); *Policastro*, 297 F.3d at 540 (employing an objective, "reasonable person" standard). Although the majority purports to apply an objective standard in the present case, its analysis belies that contention.

The majority recognizes that Keeton agreed to relocate in his initial job application, that he agreed to the transfer to Cannonsburg when Abdalla offered it to him, and that "Keeton did not present any evidence that Cannonsburg was objectively a worse location than Walton." Maj. Op. at 4. Notwithstanding these facts, the majority concludes that a reasonable person who has twice agreed to relocate suffers a materially adverse change in the terms and conditions of his employment when a geographic, lateral transfer takes place. This is so, the majority says, because Keeton originally agreed to relocate "for advancement within the company and not as a result of unlawful sexual harassment." Maj. Op. at 5. What renders the lateral transfer here adverse in the eyes of the majority, then, are not the objective effects of the transfer, but rather Keeton's subjective expectations as to the reasons for being transferred and the particular circumstances of his family life. This subjective analysis stands in stark contrast to the objective standard normally used, which examines the employment decision from the point of view of a reasonable person, not that of a person who expected to be transferred for only one reason and whose spouse is unable to move.

The majority's failure to acknowledge the subjective nature of its analysis is not surprising, given that our sister circuits have uniformly endorsed an objective standard for analyzing potentially adverse employment actions. *See Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441, 1448 (11th Cir. 1998) (finding "no case, in this or any other circuit, in which a court explicitly relied on the subjective preferences of a plaintiff to hold that [the] plaintiff had suffered an adverse employment action"). Such a standard is consistent both with the one used to evaluate "employers' claims and defenses" in suits brought pursuant to federal anti-discrimination laws, *id.* at 1450, and with the purpose behind the adverse-employment-action requirement—namely, "to prevent the kind of claims based upon trivial employment actions that a strictly literal reading of" the laws would allow. *White*, 364 F.3d at 799.

In contrast, evaluating the subjective impressions or motivations of either the employer or the affected employee threatens the integrity and coherence of the *McDonnell Douglas* framework. The Eleventh Circuit cogently explained in *Doe* that adopting a test for adversity based on a plaintiff's subjective preferences

> would create an odd situation in which a plaintiff could use the *McDonnell Douglas* test not only to avoid having to prove directly his employer's discriminatory intent, but also to force his employer to either disprove the plaintiff's own subjective feelings or concede an element of the plaintiff's *prima facie* case.

*Doe*, 145 F.3d at 1451. On the other hand, allowing a plaintiff to base the adversity of the employment decision on the strength or persistence of an employer's discriminatory animus, as the magistrate judge did in the present case, confuses proof of discrimination, whether direct or

circumstantial, with evidence that the victim of that discrimination has suffered a materially adverse change in the terms or conditions of his employment. This diminished quantum of proof reduces the efficacy of the adverse-employment-action element as a filter for shielding businesses from liability for employment decisions that do no more than inconvenience an employee. *See White*, 364 F.3d at 799.

Applying an objective standard, numerous decisions have made explicit what was implicit as far back as *Spring*—that, in Judge Posner's words, "a *purely* lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action." *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996) (emphasis in original); *accord Doe*, 145 F.3d at 1449 (agreeing that "a truly lateral transfer cannot be adverse"); *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999) ("[A] plaintiff who is made to undertake or who is denied a lateral transfer . . . does not suffer an actionable injury unless there are some other materially adverse consequences affecting the terms, conditions, or privileges of her employment . . . ."). Unfortunately, the majority deviates from this bright-line, objective rule and concludes that Keeton's transfer to Cannonsburg, which the parties agree did not alter "the terms, conditions, or privileges" of his employment, *Brown*, 199 F.3d at 457, is somehow distinguishable from the lateral transfers that courts uniformly deem not to be adverse.

In the end, the majority simply fails to demonstrate how Keeton's transfer to Cannonsburg, a move in which he acquiesced, was "objectively equivalent" to a demotion. *See Doe*, 145 F.3d at 1450 (observing that the circuits "have only held transfers to be adverse where the transfers were objectively equivalent, at least to some degree, to demotions"). However inconvenient it may have been, Keeton's transfer to Cannonsburg was far from a demotion. He retained the same job title, pay, and benefits, including his salary for the week that it took him to take up his new post. Yet instead of rewarding Flying J for its prompt actions in remedying the transgressions of a rogue supervisor, the majority punishes the company and thereby chills the type of corrective action that Title VII should encourage, not deter.

## C.     The majority's opinion undermines the policies underlying Title VII

The policies underlying recent decisions in this area by the Supreme Court also weigh strongly in favor of reversal. In defining the various theories of liability under Title VII and the defenses thereto, the Supreme Court has sought to encourage employers to implement internal mechanisms for weeding out discriminatory conduct. *See Burlington Indus.*, 524 U.S. at 765; *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998) (establishing an affirmative defense, in hostile-work-environment cases, for employers who put in place procedures to prevent and promptly correct sexually harassing behavior). But the Court in *Burlington Industries* and *Faragher* specifically refused to tie the hands of companies by requiring, as a matter of law, that they promulgate antiharassment policies in order to invoke the affirmative defense. *See Faragher*, 524 U.S. at 807. Title VII, at least in the Court's view, affords companies the flexibility necessary to devise internal remedies to discriminatory conduct and personnel problems.

Here, however, the majority is essentially telling Flying J that only one course of action in response to Keeton's allegations would have permitted it to avoid liability—the firing or transferring of Judy Harrell, Keeton's supervisor. Instead, Flying J acted promptly on Keeton's complaint, knowing that it could not keep Keeton and Harrell at the same location. But, as the majority holds today, Flying J was unable to avoid liability by transferring Keeton, despite his expressed willingness to move to the district managed by Abdalla. The only solution, therefore, would have been to fire or transfer Harrell, the store manager, a move that would have required identifying another location with a managerial vacancy or displacing another worker. Nothing in Title VII commands that a company's options for handling discriminatory conduct be so limited.

Outside of the broader policy implications of the majority's reasoning, I believe that today's decision sends the wrong message to employers. Flying J acted expeditiously in responding to allegations of sexual harassment against one of its employees, quickly corrected a supervisor's unlawful abuse of power, and immediately reinstated the employee who was wronged. This company, and others like it, must continually monitor and correct discriminatory conduct on the part of their supervisory employees. Unfortunately, today's decision both reduces companies' incentives to combat discriminatory behavior and limits the solutions that those companies can lawfully implement in the face of such behavior. When combined with a lack of support in the decisions of this or any other court, these pernicious policy consequences counsel against reaching the result that the majority does today.

### III. CONCLUSION

Keeton is undoubtedly a sympathetic plaintiff, and the majority's desire to reach beyond Keeton's own arguments and find a basis for affording him relief is therefore understandable. Judicial restraint, however, cautions against adopting a position whose merits have not been advocated even by the party seeking relief. *See, e.g.*, *McCleskey v. Zant*, 499 U.S. 467, 523 n.10 (1991) (explaining the principle that an appellate argument, even if presented to the reviewing court by an amicus, will not be considered "when that argument . . . was not advanced . . . by the party on whose behalf the argument is being raised"). This cardinal principle is especially true where, as here, endorsing that untested position constitutes a marked deviation from consistent precedent and from the policies underlying the federal laws at issue.

Instead of breaking new ground, as the majority does, I would simply adhere to the existing caselaw and reaffirm the conclusion that those cases universally reach—that geographic inconvenience alone does not convert a purely lateral transfer into an adverse employment action. This is true even when, as here, the transfer is the employer's solution to quid pro quo harassment caused by the employee's supervisor. I would therefore reverse the judgment of the district court and remand the case with instructions to grant Flying J's motion for judgment as a matter of law. From the majority's contrary conclusion, I respectfully dissent.