OPINION
SOLOMON OLIVER, JR., District Judge.
Plaintiff/Appellant William Sanford (“Sanford”) appeals the order of the district court granting summary judgment to Defendants/Appellees Main Street Baptist Church Manor (“Manor”) and Southeastern Management Center, Inc. (“Southeastern”) (collectively, “Defendants”) on Sanford’s claims of hostile environment sexual harassment, quid pro quo sexual harassment, and retaliation, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (“Title VII”) and the Kentucky Civil Rights Act (“Kentucky Act”), Ky.Rev.Stat. § 344.040. The Manor cross-appeals the order of the district court denying its Motion to Dismiss, arguing that the Manor does not have sufficient employees to fulfill the employee-numerosity requirement under federal or state law.
For the following reasons, we REVERSE the district court’s order denying the Manor’s Motion to Dismiss based on this court’s finding that the district court incorrectly applied the joint employer doctrine to conclude that the Manor had the requisite number of employees to be liable under Title VII and the Kentucky Act and REMAND the case to the district court for redetermination of the issue consistent with this court’s opinion. We also REVERSE the district court’s order granting summary judgment to the Manor and Southeastern on Sanford’s hostile environment sexual harassment and retaliation claims, but we AFFIRM the district *589 court’s order granting summary judgment to the Manor and Southeastern on the quid pro quo sexual harassment claim.
I. BACKGROUND AND PROCEDURAL HISTORY
A. Motion to Dismiss
The Manor is a nonprofit organization that operates a 64-unit apartment building in Lexington, Kentucky. The Manor receives federal financial assistance from the Department of Housing and Urban Development (“HUD”) as a designated Section 8 housing facility. During the 2003 and 2004 calendar year, the Manor employed no more than six employees for twenty weeks or more, and during the 2005 calendar year, the Manor employed no more than four employees for twenty weeks or more. (Manor Employee List, J.A. at 91-93.) The Manor has eleven members on its Board of Directors, all of whom are unpaid volunteers with paid occupations separate from their volunteer duties on the Manor Board. Sanford was employed by the Manor as a part-time summer maintenance worker in 1999. He assumed a full-time maintenance worker position at the Manor in August 2000 and also provided courtesy (or security) services.
Southeastern is a property management company that provides management assistance and performs other functions for facilities at the Manor. Southeastern provides assistance to the Manor’s Board of Directors in its operation of the Manor, with a particular emphasis on making sure the Manor complies with HUD regulations. The district court noted that the Management Plan between the Manor and Southeastern provides that Southeastern is the “exclusive agent for the management of the property” and determines the “number, qualifications, and duties of the personnel to be regularly employed in the management of the project, including a Resident Manager and maintenance, bookkeeping, clerical, and other managerial employees.” The Plan sets forth Southeastern’s duties with respect to the project, including: (1) assumption of “prime responsibility for all facets of operation”; (2) providing accounting services; (3) hiring, paying, and supervising employees; (3) maintaining the property; (4) advertising and helping ensure that vacant apartments are filled; and (5) ensuring compliance with HUD regulations. (Order, J.A. at 41-42.) Southeastern denies that it ever maintained an employment relationship with Sanford.
The Manor and Southeastern moved to dismiss Sanford’s Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be granted, arguing that the Manor could not establish the fifteen-employee numerosity requirement of Title VII or the eight-employee numerosity requirement of the Kentucky Act. The district court treated both motions as summary judgment motions because they were filed long after discovery had commenced, and both parties relied on materials outside the pleadings to support their position.
The district court noted that there is apparently no dispute that the Manor did not, at any time, have the requisite number of employees to satisfy the numerosity requirements. (Id.) However, Sanford attempted to overcome the employee-numerosity requirement by relying on the doctrines of single employer and joint employer, whereby a defendant that does not directly employ a plaintiff may still be considered an employer for Title VII purposes in certain circumstances. (J.A. at 37-38.)
*590 Specifically, Sanford argued before the district court that the Manor and Main Street Baptist Church,[2] who is not a party to this action, are so interrelated as to constitute a “single employer” with a sufficient number of employees to satisfy Title VII’s employee-numerosity requirement. (J.A. at 37.) Second, Sanford argued that Southeastern maintains sufficient control over the Manor’s employees such that it is a “joint employer” for purposes of Title VII. (J.A. at 38.) However, upon review of the parties’ briefing, the district court granted Sanford’s motion for a ruling that Southeastern and the Manor are joint employers. The district court denied Defendants’ Motion to Dismiss as moot. Having determined that the Manor satisfied Title VII’s employee-numerosity requirement based on the application of the joint employer doctrine, the court did not address the single employer doctrine. (Order, J.A. at 44.)
B. Summary Judgment
Sanford alleges that he was sexually harassed by his supervisor, Marla Carter (“Carter”), who was also a Manor employee, while he worked as a Manor maintenance worker from 2000 until he quit in March 2005. Sanford subsequently asserted hostile environment sexual harassment, quid pro quo sexual harassment, and retaliation claims against the Manor and Southeastern, pursuant to Title VII and the Kentucky Civil Rights Act. The district court summarized the following relevant facts in support of these claims:
Sanford began working at the Manor as a part-time summer maintenance worker in 1999. In August 2000, Sanford assumed a full-time maintenance worker position at the Manor and also provided courtesy (or security) services. Sanford was hired based on the recommendation of his stepfather, Greg Bolton, who was the Manor’s property manager at the time. Sanford performed both maintenance and courtesy services for the Manor. Because the Manor is a designated Section 8 housing facility which receives federal assistance from [HUD], it is required by law to comply with HUD regulations and is subject to HUD inspections. As a result of an October 2003 HUD inspection of the Manor, Sanford’s work performance came under scrutiny.
In January 2004, Carter was hired to replace Bolton as property manager of the Manor. In February 2004, Carter prepared several memoranda which requested that Sanford: (1) perform some maintenance; (2) move his ear; (3) alter his work schedule (and informed him of the Manor’s overtime policy); and (4) provide Carter with access to all property keys. According to Sanford, the memos were simple written requests, although the defendants contend that the memos constitute write-ups for misbehavior and insubordination.
Sanford alleges that in March 2004, Carter began to flirt with him. According to Sanford, the flirtation escalated over time and continued through April 2004. On one occasion, Carter asked to smell Sanford’s cologne, and instead kissed him on the neck. On another occasion, Carter pinched Sanford on the bottom. She also tapped him on the *591 bottom between 15 and 20 times. Carter made repeated sexual innuendos and suggestive statements toward Sanford, including describing her sexual abilities. Carter suggested they go out of town together, offered to purchase him a new suit, and ensured him that she would see that his shift at the Manor was covered. Carter showed up uninvited at his Manor apartment at night on several occasions to check on him and bring him food. On one occasion in April 2004, Sanford did volunteer to drive Carter to her uncle’s funeral on the assumption that his mother would also ride with them. However, Sanford’s mother was unable to go, and during the ride Sanford alleges that Carter engaged in sexual conversation and groped him in the groin. As a result, Sanford arranged for Carter to ride home with someone else.
As a result of Carter’s alleged harassment, Sanford contends that he attempted to avoid Carter, which inevitably disrupted his work progress. At some point after the trip to the funeral, Sanford orally reported the alleged harassment to Jean Peyton, Southeastern’s director of retirement housing, who allegedly took no action. In June or July 2004, Sanford orally reported the alleged harassment to Elder Cornelius, who instructed him to contact Elder Ward. Both Elder Cornelius and Elder Ward are members of the Manor’s board of directors. When he contacted Elder Ward, Sanford was instructed to report to Elder Ward’s home, where he orally repeated his claims of sexual harassment, yet he contends that no action was taken.
After making these oral reports of sexual harassment, Sanford claims that his job at the Manor took a downward spiral. He cites the following events as evidence of the defendants’ retaliation. First, Sanford claims that Carter began to write him up, accusing him of laziness, not doing his work, and of being vulgar and verbally abusive to the residents. Second, Sanford points to the timing and outcome of his August 2004 job evaluation as evidence of retaliation. Sanford claims that although the evaluation was to be completed by August 1, 2004, Carter did not complete the evaluation until August 9, 2004. He also complains that he received a score of only 66 (a score of 80-95 was required for the full 5.5% pay raise), and although the evaluation recommended a pay raise, Sanford contends that he did not receive a pay raise. Third, Sanford claims that Carter and Peyton recommended to the Manor’s board that he be placed on probation or terminated. Fourth, Sanford claims that in October 2004, Carter and Peyton accused him of stealing a resident’s pills to a police officer investigating the theft of medication from a resident. Fifth, Sanford contends that the defendants removed his pager and forced him to move out of his apartment in two weeks instead of four. Sixth, Sanford was also informed that his courtesy services would no longer be needed. Because Sanford depended upon both his maintenance and courtesy paycheck, he resigned from his position at the Manor in 2005 because he could no longer sustain himself on his maintenance paycheck alone. Finally, Sanford claims that despite assuring him that his unemployment would not be contested when he applied for unemployment benefits, the defendants challenged his application.
The district court judge granted summary judgment in Defendants’ favor on Sanford’s hostile environment sexual harassment, quid pro quo sexual harassment, and retaliation claims. The district *592 court concluded that the Manor and Southeastern were not vicariously liable for Carter’s harassment because Defendants established the affirmative defense set forth in Faragher v. Boca Raton, 524 U.S. 775, 808, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). The district court also found that Sanford failed to establish a prima facie retaliation case and, in the alternative, failed to show that the Manor and Southeastern’s legitimate, non-discriminatory reason for removing all of Sanford’s courtesy duties was pretext for retaliation.
II. STANDARD OF REVIEW
As stated above, the district court treated the Manor and Southeastern’s Motion to Dismiss and Sanford’s Motion for a ruling that Southeastern and the Manor are joint employers as summary judgment motions. A district court’s decision to grant a motion for summary judgment is subject to de novo review. Little v. BP Exploration & Oil Co., 265 F.3d 357, 361 (6th Cir.2001). Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); LaPointe v. UAW, Local 600, 8 F.3d 376, 378 (6th Cir.1993).
III. LAW AND ANALYSIS
A. Motion to Dismiss
As stated above, an employee must show that an employer has at least fifteen employees to meet the employee-numerosity requirement of Title VII, § 2000e(b), and at least eight employees to meet the employee-numerosity requirement of the Kentucky Act. The Manor does not challenge the district court’s conclusion that the Manor and Southeastern are joint employers. Rather, the Manor argues that the district court’s finding that Southeastern and the Manor are joint employers does not add to the Manor’s employee count for numerosity purposes under Title VII or the Kentucky Act because: (1) the Manor included all of those individuals employed by the Manor; and (2) the Manor did not exercise any employment authority over any Southeastern-specific employees such that the Manor’s employee count would increase. Conversely, Sanford argues that the Southeastern employees that performed the work set forth in the Plan between the Manor and Southeastern should be aggregated with the Manor’s employees for purposes of determining whether the Manor has the requisite number of employees to be liable under Title VII. Sanford maintains that, “the Manor has given full contractual authority to Southeastern to run the Manor, and it should not be permitted to avoid liability through convenient ambiguity about who works for whom.” (Appellant’s Third Br. at 56, n. 22.) For the following reasons, the court finds that the Manor’s position is well-taken.
While the Sixth Circuit in Swallows v. Barnes & Noble Book Stores, 128 F.3d 990, 993 n. 4 (6th Cir.1997), recognized that the single employer and joint employer doctrines were analytically distinct, the Swallow plaintiffs never argued that the defendant employers acted as joint employers, and the Sixth Circuit therefore did not address the merits of such a claim. Thus, the issue of whether and how different employees of joint employers may be aggregated for purposes of satisfying the numerosity requirement is an issue of first impression in the Sixth Circuit. The Second Circuit, in Arculeo v. On-Site Sales & Mktg., L.L.C., 425 F.3d 193, 198 (2d Cir. 2005), explained when two employers may be considered “joint employers”:
*593 A conclusion that employers are “joint” assumes that they are separate legal entities, but that they ... handle certain aspects of their employer-employee relationship jointly. Where this doctrine is operative, an employee, formally employed by one entity, who has been assigned to work in circumstances that justify the conclusion that the employee is at the same time constructively employed by another entity, may impose liability for violations of employment law on the constructive employer, on the theory that this other entity is the employee’s joint employer.
Id. at 198.
The Arculeo court stated that the Second Circuit “has never discussed the somewhat different, but related, question whether employees of different entities may be aggregated under ... [a] joint employer doctrine to satisfy Title VII’s fifteen-employee threshold.” Id. As a preliminary matter, Arculeo explained that aggregation of employees under the joint employer doctrine functions differently than aggregation under the single employer doctrine. Id. at 200. Specifically, all of the employees of the single employer entities are aggregated for numerosity purposes. Id. Conversely, not all of the employees of joint employers are automatically aggregated:
When the circumstances of one employee’s employment justify the conclusion that she is being employed jointly by two distinct employers, it does not follow that all the employees of both employers are part of an integrated entity encompassing both. A joint undertaking by two entities with respect to employment may furnish justification for adding to the employees of one employer those employees of another who are jointly employed by the first, but such joint undertaking does not furnish logical jus-
tification for adding together all the employees of both employers, unless the circumstances justify the conclusion that all the employees of one are jointly employed by the other.
Id. Arculeo points to the EEOC Compliance Manual as guidance for determining when aggregation of the employees of joint employers is appropriate. Id. The Manual explains, “To determine whether a respondent is covered, count the number of individuals employed by the respondent alone and the employees jointly employed by the respondent and other entities.” Id. (citing EEOC Compliance Manual Section 2-111(B)(1)(a)(iii)(b)). As an illustrative example, the Manual provides: “CP files a charge against ABC Corp. alleging that she was subjected to religious harassment. ABC Corp. has 13 regular employees and five employees assigned by a temporary agency. ABC is covered under Title VII because it has 18 employees.” Id. Significantly, Arculeo recognized that “the analysis is not affected by the number of other persons employed by the temporary agency who are not assigned to work at ABC.” Id. Applying this analysis to the facts presented in the case before it, the Arculeo court concluded that “the plaintiff has not shown circumstances that would justify a finding that either [joint employer] should be deemed to have fifteen employees.” Id. at 199-200.
In considering the parameters of the joint employer doctrine as it applies to numerosity, the district court in United States EEOC v. Custom Companies, Case Nos. 02 C 3768, 03 C 2293, 2007 WL 734395, at *5-8, 2007 U.S. Dist. LEXIS 16691, at *15-24 (N.D.I11. March 8, 2007), also recognized that several other jurisdictions have allowed aggregation in certain circumstances. Id. at *6, 2007 U.S. Dist. LEXIS 16691, at *17-18 (citing Arculeo; Trainor v. Apollo Metal Specialties, Inc., *594 318 F.3d 976 (10th Cir.2002) (considering whether temporary workers were sufficiently controlled as to be aggregated)); Burdett v. Abrasive Eng’g & Tech., Inc., 989 F.Supp. 1107 (D.Kan.1997) (plaintiff could aggregate employees of staffing agency, as long as those employees were staffed with the employer and employer exercised sufficient control over the employees); Stone v. Ind. Postal & Fed. Employees Credit Union, No. 1:05-CV-115, 2005 WL 2347226, at *1, 2005 U.S. Dist. LEXIS 21493, at *2-4 (N.D.Ind. Sept. 25, 2005) (plaintiff attempts to aggregate committee members based on argument that they are like temporary employees, but fails because committee members are not employees at all).
The Custom Companies court emphasized that, in aggregating employees, “only those employees over whom the employer has a certain amount of control should be counted.” Id. at *7, 2007 U.S. Dist. LEXIS 16691, at *19. The Custom Companies court applied the following test to determine when aggregation is appropriate:
(1) the extent of the employer’s control and supervision over the worker, including directions on scheduling and performance of work; (2) the kind of occupation and nature of skill required, including whether skills are obtained in the work place; (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations; (4) method and form of payment and benefits; and (5) length of job commitment and/or expectations.
Id. at *7, 2007 U.S. Dist. LEXIS 16691, at *20 (quoting Piano v. SBC/Ameritech, No. 02 C 3237, 2003 WL 260337, at *2, 2003 U.S. Dist. LEXIS 1696, at *5 (N.D.I11. Feb. 3, 2003)). The Custom Companies court stated that “the first factor is the most significant consideration.” Id. Similarly, in Arculeo, 425 F.3d at 202, the court noted that, “at least in the NLRB context, we have identified a variety of factors, such as exercise of authority to hire, fire, and discipline, control over pay and insurance, and supervision, which can bear on whether an entity, which is not the formal employer, may be considered a joint employer.”
We find the reasoning in the cases discussed above to be persuasive and therefore hold that aggregation of joint employees for the purposes of establishing the Title VII numerosity requirement is permissible when one joint employer exercises control over the employees of the other joint employer. In this case, however, the district court failed to conduct the necessary aggregation analysis set forth in Arculeo and the EEOC Compliance Manual, i.e., it did not “count the number of individuals employed by [the Manor] alone and the employees jointly employed by [the Manor] and [Southeastern]” in determining whether the Manor had the requisite number of employees. The district court merely noted provisions of the Agreement and Plan between Southeastern and the Manor providing that Southeastern is the Manor’s exclusive agent for managing the property.[3] The opinion on *595 this issue is completely devoid of any analysis regarding the number of employees from Southeastern that were arguably attributed to the Manor as joint employees or any discussion of the nature and control of the extent to which the Manor exercised control over' the Southeastern employees.
We therefore REVERSE the district court’s finding that the Manor satisfies the numerosity element of Title VII and the Kentucky Act and REMAND the case to the district court for redetermination of the issue. On remand, the district court should consider, with respect to every Southeastern employee working at the Manor, whether: (1) the Manor had the authority to hire, fire, and discipline the Southeastern employee; (2) the Manor could affect the Southeastern employee’s compensation or employment benefits; and (3) the degree to which the Manor’s management supervised the Southeastern employee, including directing the employee’s schedule and daily assignments, and any other pertinent factors. The district court may assign weight to each factor according to the circumstances of each employee.
B. Summary Judgment against the Manor and Southeastern
1. Hostile Environment Sexual Harassment Claim
Sanford argues that Carter’s conduct created a hostile work environment in violation of Title VII. To establish a prima facie case of sexual harassment based on a hostile work environment, a plaintiff must show that:
(1) he is a member of a protected class; (2) he was subjected to unwelcome sexual harassment; (3) the harassment was based on his sex; (4) the harassment
created a hostile work environment; and (5) the employer is vicariously liable. Clark v. UPS, 400 F.3d 341, 347 (6th Cir. 2005.) The Defendants only disputed the fourth and fifth elements of the hostile environment claim before the district court. (J.A. at 50.) The district court concluded that Sanford met the objective and subjective components of the fourth element, and this court finds that the district court did not err in making this determination. (Id.) The court then applied the affirmative defense outlined in Faragher v. City of Boca Raton, 524 U.S. 775, 807-08, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). (Order, J.A. at 51-52.) The court held that Defendants could prevail on the Faragher affirmative defense because: (a) they exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (b) Sanford failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise. (J.A. at 51-53.) For the following reasons, we hold that the district court erred.
To prevail on the Faragher defense, Southeastern must show that:
(a) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (b) the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise.
Faragher, 524 U.S. at 807-08, 118 S.Ct. 2275.
First, Sanford argues that the district court erred in finding that Southeastern had exercised reasonable care to prevent and correct any sexually harassing behavior by the existence of a policy in the Southeastern Handbook (“Handbook”). *596 Specifically, Sanford points out that the Handbook does not satisfy the requirements of an effective sexual harassment policy set forth in Clark v. United Parcel Service, Inc., 400 F.3d 341, 350-51 (6th Cir.2005), wherein the Sixth Circuit concluded that:
While there is no exact formula for what constitutes a “reasonable” sexual harassment policy, an effective policy should at least: (1) require supervisors to report incidents of sexual harassment; (2) permit both informal and formal complaints of harassment to be made; (3) provide a mechanism for bypassing a harassing supervisor when making a complaint; and (4) provide for training regarding the policy.
(Citation omitted.)
Here, Sanford has raised a genuine issue of material fact regarding whether the Manor and Southeastern can satisfy the Faragher affirmative defense. As a preliminary matter, the portion of the Handbook referenced by the district court is a four-paragraph section addressing generic “Grievance Procedures.” No mention is made of discrimination or harassment.
Yet, even if the Handbook specifically addressed harassment, it does not comply with the standards set forth in Clark. First, the Handbook lists no requirement that the supervisor report incidents of sexual harassment. (Handbook, J.A. at 486.) Second, the Handbook’s procedures do not provide for an informal or non-written complaint but instead mandate that if an employee “feels aggrieved in anyway regarding his employment, it is his responsibility to express the grievance in writing to his immediate supervisor.” (Id.) Third, a harassing supervisor cannot be avoided: “If the supervisor is part of the grievance, then the employee and the supervisor should request a meeting with the property manager to mediate the grievance.” (Id.) Finally, while Sanford attended several meetings where the discrimination policy was discussed, Carter testified that she had never spoken to anyone about the sexual harassment policy, or even about sexual harassment generally, and had never attended a meeting about sexual harassment. (Carter Dep., J.A. at 397.) Based on this court’s finding that Sanford has raised a genuine issue of material fact regarding whether the Manor and Southeastern can establish the first prong of the Faragher defense in light of Clark, the court reverses the district court’s order granting summary judgment in favor of the Manor and Southeastern on Sanford’s hostile environment sexual- harassment claim.
2. Quid Pro Quo Sexual Harassment Claim
Sanford’s claim for quid pro quo sexual harassment is based on Carter’s promise that she would ensure Sanford’s courtesy shift was covered if he would travel out of town with her. (Order, J.A. at 53-54.) However, when he did not report to work on August 14, after refusing her alleged advances and reporting her conduct to superiors, Sanford alleges that Carter recommended he be fired and took other adverse actions against him. To succeed on a quid pro quo sexual harassment claim, Sanford must show:
(1) he is a member of a protected class; (2) he was subjected to unwelcome sexual harassment; (3) the harassment was based on his sex; (4) his refusal to submit to the unwelcome demands resulted in an adverse employment action[4]; and *597 (5) liability may be imputed to the employer.
The court noted that the Defendants conceded the first three elements of the claim. (J.A. at 54.) However, the district court concluded that Sanford failed to meet the fourth element because he did not show an adverse employment action as a result of his failure to submit to Carter’s unwelcome sexual advances. (Id.)
To satisfy the fourth element Sanford must establish: (1) a tangible employment action or detriment; and (2) a causal relationship between the tangible employment action and Carter’s alleged actions. See Howington v. Quality Rest. Concepts, LLC, 298 Fed.Appx. 436, 442-43 (6th Cir. 2008). Tangible employment actions “are the means by which the supervisor brings the official power of the enterprise to bear on subordinates.” Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 762,118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Tangible employment actions are significant changes in employment status, “such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, a change in benefits, or other factors unique to [his] particular situation.” Akers v. Alvey, 338 F.3d 491, 497-98 (6th Cir.2003). The Sixth Circuit has also recognized that a “loss of pay” can constitute a tangible job detriment. See Thornton v. Fed. Express Corp., 530 F.3d 451, 454-55 (6th Cir.2008). In general, a change in employment conditions “must be more disruptive than a mere inconvenience or an alteration of job responsibilities.” Crady v. Liberty Nat’l Bank and Trust Co., 993 F.2d 132, 136 (7th Cir.1993). For the following reasons, we find that Sanford failed to present evidence to establish a prima facie quid pro quo sexual harassment claim.
The district court correctly determined that the following actions did not constitute tangible employment actions for the following reasons: (1) Carter’s “write-ups” of Sanford did not amount to a significant change of job status sufficient to constitute a materially adverse employment action; (2) Carter’s eight-day delay in evaluating Sanford and not giving him a score that would provide him with a pay raise do not constitute materially adverse employment actions because the Manor Board promptly ordered that Sanford receive a positive job evaluation and full raise retroactive to August 1, 2004; (3) Carter’s recommendation to the Board that Sanford be placed on probation was not acted upon by the Board and therefore did not result in a materially adverse employment action; (4) the alleged statements by Peyton and Carter to a police officer that Sanford stole medications from a resident did not constitute a materially adverse employment action because it did not result in a significant change in his job status; (5) the removal of Sanford’s pager in August 2004 did not rise to the level of a significant change in employment status because it was merely an inconvenience and therefore was not a materially adverse employment action; (6) the Manor Board’s decision to give Sanford only two weeks to move out of his apartment rather than four weeks does not amount to a significant change in job benefits under the circumstances, and is therefore not a materially adverse employment action; and (7) the Manor’s post-employment decision to challenge Sanford’s unemployment benefits does not constitute an adverse employment action sufficient to confer Title VII liability upon the Manor. (Order, J.A. at 56-57.)
Additionally, the court notes that the district court’s opinion failed to consider two arguments Sanford presented to sat *598 isfy the fourth prong of his quid pro quo sexual harassment claim. (See Pl.’s Opp’n to Defs.’ Summ. J. Mot. at 35.) First, Sanford points to the Board’s decision to take away Sanford’s courtesy duties as an example of a tangible employment action that he suffered as a result of Carter’s alleged harassment. Since the loss of courtesy duties resulted in a significant loss in pay, this action does constitute a tangible employment action. Thornton, 530 F.3d at 454-55. However, Sanford fails to show evidence of a causal relationship between the tangible job detriment and Carter’s alleged actions. Sanford asserts that the Board “was tainted by Carter’s campaign of complaints about Sanford’s work performance and so-called ‘insubordination.’ ” (J.A. at 22-23, citing Shager v. Upjohn, 913 F.2d 398, 400 (7th Cir.1990)). Yet, Sanford concedes that this tangible employment action was the Board’s decision and hot Carter’s decision, as Carter had been terminated by the Board a month before. Shager, which involved an age discrimination claim, is inapposite because, unlike the supervisor in Shager, whose influence “may well have been decisive” in the committee’s decision to fire the employee, there is no evidence that Carter exerted such influence over the Board. Moreover, Carter was terminated by the Board a month before the Board decided to take the courtesy position away from Sanford. In light of the Sixth Circuit’s finding in Idusuyi v. State of Tennessee Department of Children’s Services, 30 Fed.Appx. 398, 401 (6th Cir. 2002), that a causal relationship between refusal of sexual advances and an adverse employment action was not established when the alleged former harasser had no formal role in making the materially adverse employment decision, Sanford fails to demonstrate the necessary causal relationship required by the fourth prong.
That is, Sanford did not produce evidence that the loss of his courtesy position occurred because of Carter’s alleged harassment.
Second, Sanford argues that he experienced a tangible employment action because he was “reduced to picking up trash.” Specifically, Sanford argues that outside contractors were called in for a few weeks to rectify urgent maintenance issues identified by HUD. However, assuming the truth of Sanford’s assertion, it does not constitute a tangible employment action because it is merely an alteration of job responsibilities for only a few weeks. Accordingly, since Sanford cannot show that he experienced a tangible employment action as a result of Carter’s alleged actions, the court affirms the district court’s order granting summary judgment to Defendants on Sanford’s quid pro quo hostile environment claim.
3. Retaliation Claim
Sanford advanced a retaliation claim based on his contention that, due to his complaints of Carter’s sexual harassment to Peyton, Manor Board members Ward and Cornelius, and the full Manor Board, the Defendants retaliated against him. (J.A. at 58.) To establish a prima face case of retaliation, a plaintiff must establish:
(1) that [he] engaged in a protected activity; (2) that the defendant had knowledge of [his] protected conduct; (3) that the defendant took an adverse employment action towards [him]; and (4) that there was a causal connection between the protected activity and the adverse employment action.
Weigel v. Baptist Hosp. of E. Tennessee, 302 F.3d 367, 381 (6th Cir.2002). A plaintiffs “burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met.” DiCarlo v. Potter, *599 358 F.3d 408, 420 (6th Cir.2004). Once a prima facie case is established, the burden of producing some legitimate, non-discriminatory reason falls upon the defendant. Id. If the defendant produces such a reason, the burden then shifts back to the plaintiff to show that the defendant’s proffered reasons are pretext for retaliation. Id. To show pretext, a plaintiff must demonstrate that “the proffered reason: (1) has no basis in fact; (2) did not actually motivate [the defendant’s] challenged conduct; or (3) was insufficient to warrant the challenged conduct.” Wexler v. White’s Fine Furniture, 317 F.3d 564, 576 (6th Cir.2003).

a. Prima Facie Claim

The district court correctly determined that Sanford satisfied the first two elements of a prima facie retaliation claim. With respect to the “adverse employment action” prong of a prima facie retaliation claim, the Sixth Circuit has recognized:
In contrast to Title VII’s discrimination provision, the “adverse employment action” requirement in the retaliation context is not limited to an employer’s actions that affect the terms, conditions, or status of employment, or those acts that occur in the workplace. The retaliation provision instead protects employees from conduct that would have “dissuaded a reasonable worker from making or supporting a charge of discrimination.”
Niswander v. Cincinnati Ins. Co., 529 F.3d 714, 720 (6th Cir.2008) (citing Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)). A materially adverse action does not include trivial harms, such as “petty slights or minor annoyances that often take place at work and that all employees experience.” Burlington, 548 U.S. at 68,126 S.Ct. 2405.
We hold that the district court correctly found the loss of all of Sanford’s courtesy duties, which resulted in a 75% decrease in Sanford’s pay, constituted an adverse employment action under Burlington because it would have dissuaded a reasonable worker from making or supporting a charge of discrimination. However, we find that the district court erred in determining that other actions Sanford argues are materially adverse and which occurred within a relatively short period of time after Sanford’s complaints to Ward or Cornelius of Carter’s sexual advances were not in fact materially adverse, e.g., Carter’s write-ups and the recommendation of Carter and Peyton to the Board that Sanford be terminated. Cf. Jones v. Johanns, 264 Fed.Appx. 463, 469 (6th Cir.2007) (holding that three letters from an employer to an employee over the course of three and a half years that did not contain any threats or reprimands would not dissuade a reasonable employee from making or supporting a charge of discrimination.) As the court noted in Burlington, 548 U.S. at 69, 126 S.Ct. 2405, the adverse employment action standard is phrased in general terms because “the significance of any given act of retaliation will often depend upon the particular circumstances.” The Burlington court emphasized that “[e]ontext matters.” Id. Here, while some of the incidents alone may not rise to the level of an adverse employment action, the incidents taken together might dissuade a reasonable worker from making or supporting a discrimination charge.
Finally, with respect to the fourth prong of a retaliation claim, the district court held that Sanford failed to make a prima facie claim because “temporal proximity between the protected activity and the alleged discriminatory act is alone not sufficient to establish causation.” (Order, J.A. at 59, citing Randolph v. Ohio Dep’t of Youth Services, 453 F.3d 724, 737 (6th Cir.2006)). In the alternative, the district *600 court held that, even if Sanford could show a prima facie retaliation claim, Sanford’s claim would still fail because he did not show that Defendant’s legitimate, nondiscriminatory reason for removing Sanford’s courtesy duties was mere pretext for retaliation. (Id. at A-60.) For the following reasons, we hold that the district court erred.
The Sixth Circuit in Mickey v. Zeidler Tool & Die Company, 516 F.3d 516, 524-25 (6th Cir.2008), rejected the notion that temporal proximity, standing alone, can never establish causation:
Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.
Id. at 525. However, the Sixth Circuit has not established a black letter rule regarding the role of temporal proximity in establishing the causation prong of a prima facie retaliation case. This is demonstrated by Mickey, 516 F.3d at 524, wherein the court indicated its holding in a prior case, Cooper v. City of North Olmsted, 795 F.2d 1265, 1272 (6th Cir.1986), that a temporal proximity of four months was insufficient to establish an inference of retaliation, “does not preclude plaintiffs from ever using a temporal proximity closer than four months to establish an inference of retaliation.” See also Singfield v. Akron Metro. Hous. Autk, 389 F.3d 555, 556 (6th Cir. 2004) (concluding that temporal proximity alone of three months “is significant enough to constitute sufficient evidence of a causal connection for the purpose of satisfying [the plaintiffs] burden of demonstrating a prima facie [retaliation] case.”); Goller v. Ohio Dep’t of Rehab. & Corr, 285 Fed.Appx. 250, 257 (6th Cir. 2008) (citing Mickey and Singfield to hold that a two-month temporal period between the protected activity and employee’s termination is sufficient to establish a causal connection for the purposes of establishing a prima facie retaliation case); Vaughn v. Louisville Water Co., 302 Fed.Appx. 337, 349-50 (6th Cir.2008) (assuming without deciding that the four-month temporal proximity between the protected activity and the materially adverse action is sufficient to create a causal connection, but affirming the granting of summary judgment to the defendant because it established a legitimate, non-discriminatory reason for the materially adverse action, and the plaintiff failed to show the defendant’s proffered reason was pretextual).
Here, Sanford alleges that he complained to Manor Board members Ward and Cornelius about Carter’s actions in June or July 2004, and again to the entire Board on or near August 16, 2004. Moreover, Sanford told Ward in October 2004 that he wanted to file a complaint based on Carter’s actions, and Ward explicitly directed Sanford not to make a formal complaint. Sanford’s October 2004 complaint to Ward constitutes a protected activity. See Johnson v. Univ. of Cincinnati, 215 F.3d 561, 579 (6th Cir.2000) (“complaining to anyone ... about allegedly unlawful practices” is a protected activity.) Ward notified Sanford in December 2004 of the removal of all of Sanford’s courtesy duties, which resulted in a 75% loss in Sanford’s pay and constituted an adverse employment action. Therefore, in light of Johnson, Mickey, and Singfield, we hold this two-month temporal proximity, along with the other incidents discussed above, taken *601 together, are significant enough under the circumstances of this case to constitute a genuine issue of material fact as to the element of causation.

b. Legitimate, Ncnv-Discriminatory Reason for Adverse Employment Action

Defendants asserted that its decision to eliminate Sanford’s courtesy duties was based on the fact that the overnight courtesy work was tied to occupancy of the apartment and went to the new property manager, Mark Anthony.
c. Pretext
Sanford maintains that Defendants’ proffered explanation regarding the loss of the courtesy job is actually pretext for retaliation because Defendants miseharacterize Sanford’s testimony. Specifically, Sanford maintains that Defendants failed to provide an explanation for the loss of all of his courtesy duties (not just the apartment) in their summary judgment motion before the district court. Sanford notes that Defendants did proffer an explanation regarding the loss of courtesy hours, though not in regard to all of such duties. Nevertheless, Sanford points out that the district court accepted Defendants’ explanation. The district court ruled that:
[T]he evidence reveals that the defendants’ decision to eliminate Sanford’s position in courtesy was based on the fact that this responsibility would lie with the new property manager who intended to live in the Manor apartment. Sanford has acknowledged that his work in courtesy was tied to the fact that he was living in the apartment at the time. Having proffered a legitimate non-retaliatory reason, the burden of production shifts back to Sanford to prove by a preponderance of the evidence that the legitimate reason offered was a mere pretext for retaliation. [Texas Dept, of Community Affairs v.] Burdine, 450 U.S. [248] at 256[ 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) ]; Manzer v. Diamond Shamrock Chem. Co., 29 F.3d 1078, 1082 (6th Cir.1994). Sanford has come forward with no evidence that the reason offered by the defendants was somehow a pretext for retaliation. Therefore, absent evidence that the defendant’s explanation for the job elimination is mere pretext, Sanford’s claim cannot be sustained.
(Order, J.A. at 60.)
However, Sanford argues that he did not admit that living in the apartment was tied to his courtesy job. Rather, he points to his deposition testimony wherein he stated that he was performing courtesy work before he moved into the apartment, and that when he moved into the Manor apartment he received additional courtesy hours. Sanford maintains that the additional courtesy hours—not the courtesy job—were tied to living in the apartment. Thus, Sanford argues that he satisfied his burden of presenting evidence that the Board’s decision to remove all his courtesy duties was pretext for retaliation. Sanford asserts that the question before the court is not whether Defendants “proffered legitimate, nondiscriminatory reason was in fact pretextual, but whether a factual dispute exists with respect to this question.” Vincent v. Brewer Co., 514 F.3d 489, 498 (6th Cir. 2007).
This court finds Sanford’s argument that he has presented evidence of pretext to be well-taken. As the Sixth Circuit has recognized, “pretext may be shown either directly by persuading [the trier of fact] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer’s proffered explanation is unworthy of credence.” Manzer, 29 F.3d at 1082. As stated above, a plaintiff *602 may show pretext by showing “the proffered reason: (1) has no basis in fact; (2) did not actually motivate [Defendant’s] challenged conduct; or (3) was insufficient to warrant the challenged conduct.” Wexler, 317 F.3d at 576. Here, Sanford has put forth evidence from which a trier of fact might conclude that Defendants’ explanation that all of the courtesy hours were tied' to living in the apartment had no basis in fact. Accordingly, we reverse the district court’s order granting summary judgment to the Manor and Southeastern on Sanford’s retaliation claim.
IV. CONCLUSION
For the reasons stated above, we REVERSE the district court’s order denying the Manor’s Motion to Dismiss based on this court’s finding that the district court incorrectly applied the joint employer doctrine to conclude that the Manor had the requisite number of employees to be liable under Title VII and the Kentucky Act and REMAND the case to the district court for redetermination of the issue consistent with this court’s opinion. We also REVERSE the district court’s order granting summary judgment to the Manor and Southeastern on Sanford’s hostile environment sexual harassment and retaliation claims, but we AFFIRM the district court’s order granting summary judgment to the Manor and Southeastern on Sanford’s quid pro quo sexual harassment claim.

. In his Response to the Motion to Dismiss filed with the district court, Sanford alleged that the Main Street Baptist Church ("Church”) controls the Main Street Baptist Manor ("Manor”). The precise nature of the relationship between the Manor and the Church is unclear from the parties' briefing before this court, though it is undisputed that the pastor of the Church, Dennis Ward ("Ward”), serves as chairman of the Manor's Board of Directors. (See Manor's Fourth Final Br. at 13.)

. The Agreement provides that Southeastern is the "exclusive agent for the management of the property” and determines the "number, qualifications, and duties of the personnel to be regularly employed in the management of the project, including a Resident Manager and maintenance, bookkeeping, clerical, and other managerial employees.” The Plan sets forth Southeastern's duties with respect to the project, including: (1) assumption of "prime responsibility for all facets of operation”; (2) providing accounting services; (3) hiring, paying, and supervising employees; (3) maintaining the property; (4) advertising and helping ensure that vacant apartments are filled; *595 and (5) ensuring compliance with HUD regulations.

. The Sixth Circuit noted in Bowman v. Shawnee State University, 220 F.3d 456, 462 (6th Cir.2000), that “courts use the term 'material *597 adverse employment action’ and ‘tangible job detriment’ interchangeably.”