*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0116p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

SANDRA M. CLARK; RHONDA R. KNOOP,
　　　　　　　　*Plaintiffs-Appellants,*

　　　*v.*

UNITED PARCEL SERVICE, INC.; ELI BROCK,
　　　　　　　　*Defendants-Appellees.*

No. 03-6393

---

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 01-00659—John G. Heyburn, II, Chief District Judge.

Argued: December 7, 2004

Decided and Filed: March 9, 2005

Before: GUY and COLE, Circuit Judges; TARNOW, District Judge.[*]

---

## COUNSEL

**ARGUED:** Garry R. Adams, CLAY, KENEALY, WAGNER, ADAMS & HALL, Louisville, Kentucky, for Appellants. Winston E. Miller, FROST, BROWN & TODD, Louisville, Kentucky, for Appellees. Anne Noel Occhiglino, EEOC, OFFICE OF THE GENERAL COUNSEL, Washington, D.C., for Amicus Curiae. **ON BRIEF:** Garry R. Adams, Thomas E. Clay, CLAY, KENEALY, WAGNER, ADAMS & HALL, Louisville, Kentucky, for Appellants. Winston E. Miller, Susan C. Lonowski, FROST, BROWN & TODD, Louisville, Kentucky, for Appellees. Anne Noel Occhiglino, EEOC, OFFICE OF THE GENERAL COUNSEL, Washington, D.C., for Amicus Curiae.

COLE, J., delivered the opinion of the court, in which TARNOW, D. J., joined. GUY, J. (p. 10), delivered a separate opinion concurring in part and dissenting in part.

---

## OPINION

---

R. GUY COLE, JR., Circuit Judge. Plaintiffs-Appellants Sandra Clark and Rhonda Knoop filed a hostile work environment sexual harassment claim under the Kentucky Civil Rights Act against their employer, United Parcel Service, Inc., and Eli Brock, the alleged harasser in this case.

---

[*] The Honorable Arthur J. Tarnow, United States District Judge for the Eastern District of Michigan, sitting by designation.

The district court granted summary judgment in favor of the Defendants on the grounds that UPS did not have proper notice of the harassment such that it could be held vicariously liable for it, and that Brock could not be held personally liable under the Kentucky Civil Rights Act. For the following reasons, we **REVERSE**, in part, the judgment of the district court and **REMAND** for further consideration consistent with this opinion.

## I. BACKGROUND

Plaintiffs-Appellants Sandra Clark and Rhonda Knoop filed a hostile work environment sexual harassment claim against their employer, United Parcel Service, Inc. ("UPS"), for the hostile environment that was allegedly caused by Eli Brock, one of UPS's supervisors.

UPS hired Rhonda Knoop in 1990 and she began working in the Air Cargo Resolution Group (the "Claims Department") in February 1998. Knoop handled customer calls regarding lost shipments. Eli Brock was the manager of the Claims Department during the entire two-and-a-half year period in which Knoop worked in that group. Knoop alleges that during this time, there were several instances where Brock behaved inappropriately towards her. First, Knoop contends that Brock told sexual jokes in front of her and others that she felt were inappropriate. Knoop also claims that twice, as Brock walked by her in the hall, he placed his vibrating pager against her upper thigh and asked her if it "felt good." On those occasions Knoop simply walked away. Finally, Knoop claims that in January 2001, she was wearing overalls for "dress down" day, and Brock asked her what she had on underneath them. Knoop told him that she was wearing "a thong" and then Brock grabbed the back of her overalls, as if he were trying to look down them. Knoop immediately pulled away. Knoop alleges that this incident took place in front of a UPS supervisor named Dave Roller.

UPS hired Sandra Clark in 1993. In August 1999, Clark was promoted to the position of administrative assistant in the Claims Department. Clark alleges several instances of inappropriate behavior by Brock, including:

> 1. In 1999, at a UPS luncheon, Brock asked Clark if she wanted some chips and when she said yes, he picked up the bag and held them in front of his crotch. He then laughed and lifted the bag up and then Clark took the chips from him and went to her desk. This occurred in front of a supervisor named Larry West.
>
> 2. In 1999, Brock approached Clark in the hall and said to her "you did a good job in my dream last night."
>
> 3. In 1999, Brock showed Clark an email which she believes depicted "two cartoons screwing."
>
> 4. In 1999, Clark told Brock that she needed to have a business meeting with him, and he responded by asking if she wanted to go somewhere private. After she said yes, he suggested the large storage closet by which they were standing.
>
> 5. In April 2000, some members of the Claims Department, including Clark, were moved to a new location. When Brock and the remaining members were later relocated there, he brushed his shoulder against hers and said "[t]his is the first time we've been alone since you guys moved here."
>
> 6. In August 2000, Clark was talking to her immediate supervisor, Jeannie Riggons, over a wall partition between them. Brock walked up behind Riggons and scratched the wall where Clark's breasts were located on the other side. Brock and Riggons laughed.

7.  The next day, Clark was talking to Riggons about a shipment of cherries and Brock whispered to Clark that he was jealous that she was talking about cherries with Riggons.  Clark is unsure whether Riggons heard this comment.

8. In 2001, Brock was with Clark in her cubicle, talking about a work-related matter when his vibrating pager went off.  He tossed the pager in her lap, "between her legs," and asked her "[d]oes that feel good?"  On another occasion, Brock placed the vibrating pager on Clark's waist/thigh area as he passed her in the hall.

9.  In 2001, Clark noticed that Brock was staring at her when she was standing at a printer by his office and she said, "What are you looking at?"  He responded, "I was just enjoying the view."

10.  Several times as Clark was leaving work for the day, Brock would hold out his hand as if he were going to give her an innocent "high-five," but on some occasions, instead of merely completing the gesture, he would grab her palm and scratch it with his finger.  Once, she tried to avoid him grabbing her hand and in the interaction, he grabbed her by the arm instead, twisted it, and scratched her palm again with his finger.

UPS's sexual harassment policy is published in several company policy books and manuals, and is posted on employee bulletin boards.  UPS's sexual harassment policy explains that sexual harassment includes the creation of a hostile work environment, and that harassment may include "repeated sexual innuendoes," and "off-color jokes," as well as gestures and other visual or non-verbal conduct.  The policy states that:

> Any employee who witnesses objectionable conduct or believes that he or she is subject to or may be subjected to objectionable conduct must report it immediately to a supervisor or manager, a Human Resource representative, the Human Resources manager, the Employee Relations manager, or the UPS Help Line at 1-800 . . . .  These reports may be made verbally or in writing.

The policy also states that any reports of harassment will be treated confidentially and that there will be no adverse repercussions to the employee who makes such a report.  Additionally, the UPS Policy Book, which is given to all supervisors and managers, states that "[m]anagers and supervisors are responsible for maintaining an environment free of sexual harassment.  That responsibility includes reporting incidents of sexual harassment to the appropriate management people."

Both Knoop and Clark have conceded that they were aware of the policy, had signed the policy, had undergone training regarding the policy along with all other UPS employees, and had reviewed the policy every year for the past five years.  In her deposition, Clark stated that after Brock made sexual jokes and comments, she would sometimes say to him, "You are so bad."  Unlike Knoop, however, Clark also contends that she complained about Brock to other UPS supervisors.

In 2000, several minutes after Brock scratched the wall partition behind Clark's breasts, Clark said to Riggons, "How does he get away with this[?]  Why does this happen[?]"  Clark also claims that after Brock made some sort of suggestive comment to her in front of a supervisor named Joe O'Bryan, she said to O'Bryan, "Why does nobody say anything to him when he says this type of - - makes these type of comments," and "How does he get away with doing this[?]"  Clark does not remember anything about the suggestive comment made by Brock in front of O'Bryan.  Clark also maintains that she "said something" to Dave Roller, another UPS supervisor, in 2001, but does not remember exactly what she said.  Clark stated that all these supervisors gave her virtually the same response:  they "just kind of shrugged their shoulders and said, 'I don't know.'"  Clark also

alleges that one of the supervisors, either Roller or Larry West (who witnessed the "bag of chips" incident) responded to Clark's comments by saying about Brock, "[h]e's a manager."

All of the supervisors that Clark contends witnessed particular incidents, or to whom she spoke regarding these incidents, either reported to Brock, or were equal to his rank. Riggons, for example, was Clark's direct supervisor and reported to Brock. UPS maintains that neither Clark nor Knoop complained or even commented about Brock's behavior to any supervisor, and denies that any of the alleged inappropriate behavior took place in front of any supervisor.

Regarding Brock's general office demeanor, Clark stated in her deposition that, "[Brock] did things out of the ordinary, not bad things, but like he would joke with people. He would flicker the lights on-and-off. I mean, he would do things that—he wasn't a stiff neck. I mean he was laid back and – just a lot of people in there liked him."

In mid-2001, UPS assigned Jennifer Robbins to investigate Brock for making unauthorized promises to a trucking company contractor on behalf of UPS. During the course of this investigation, Robbins spoke to Knoop on July 31, 2001, and Knoop told Robbins about Brock's inappropriate behavior towards both her and Clark. Robbins then obtained a written statement from both Knoop and Clark, and spoke to other female employees about Brock's inappropriate behavior. In mid-August 2001, Robbins concluded her investigation of both the trucking company contracts and the sexual harassment. While Robbins's report was being reviewed by UPS management, Brock was sent home. On August 24, 2001, after several department heads reviewed the report, Brock was allowed to resign under the threat of discharge. Since then, Clark and Knoop have both continued to work at UPS and have not alleged any further harassment by Brock or anyone else at the company.

On October 22, 2001, Clark and Knoop filed sexual harassment and outrageous conduct claims in state court, under Kentucky law, against UPS and Brock. UPS and Brock removed the case to federal court, which had diversity jurisdiction over the matter. The parties proceeded with discovery and then the Defendants filed a motion for summary judgment. The district court granted the Defendants' motion. The Plaintiffs appealed this decision, but only as to their sexual harassment claims against UPS.

## II. ANALYSIS

### A.  Standard of Review

We review the district court's grant of summary judgment *de novo*. *Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 710 (6th Cir. 2004). Summary judgment is proper where the movant shows through "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). To prevail, the nonmovant must rebut such a showing by presenting sufficient evidence on which a jury could reasonably find for her. *McClean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "In deciding a motion for summary judgment, this court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *Id*.

### B.  The Hostile Work Environment Claims

A sexual harassment claim brought under the Kentucky Civil Rights Act ("KRCA") is to be analyzed in the same manner as a claim brought under Title VII, its federal counterpart. *Ammerman v. Bd. of Educ. of Nicholas County*, 30 S.W.3d 793, 797-98 (Ky. 2000). "A plaintiff may establish a violation of Title VII by proving that the discrimination based on sex created a hostile or abusive

work environment." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560 (6th Cir. 1999). To establish a prima facie case of a hostile work environment based on sex, a plaintiff must show that:

> (1) she is a member of a protected class,
> (2) she was subjected to unwelcome sexual harassment,
> (3) the harassment was based on her sex,
> (4) the harassment created a hostile work environment, and that
> (5) the employer is vicariously liable.

*See Williams*, 187 F.3d at 560-561; *see also Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999) (discussing the prima facie elements of a hostile work environment claim based on race or religion).

In the present case, it is undisputed that the Plaintiffs have met the first three requirements of a hostile work environment claim. As to the fourth element – the creation of a hostile work environment – the district court concluded that Knoop's allegations, if proven true, would not rise to the level of a hostile workplace claim. The court found that Clark's contentions presented a closer case, but ultimately determined that because neither Knoop nor Clark met the fifth requirement of the test, summary judgment was warranted for the Defendants. The district court's grant of summary judgment therefore hinges on the fifth element – the requirement that the employer be found vicariously liable.

Depending upon whether the alleged harasser is a co-worker or a supervisor of the victim, there are slightly different standards for evaluating whether the employer as a whole is vicariously liable for the hostile work environment. In the case of a harassing co-worker, "[a]n employer is liable if it knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." *Hafford*, 183 F.3d at 513 (internal quotation marks omitted). By contrast, "an employer *is* vicariously liable for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee." *Jackson v. Quanex Corp.*, 191 F.3d 647, 663 (6th Cir. 1999) (emphasis added).

Here, UPS would be automatically liable for the alleged hostile work environment created by Brock because he was the manager of the entire Claims Department where both Clark and Knoop worked, and therefore had supervisory authority over them. *See Barna v. City of Cleveland*, No. 96-3971, 1998 WL 939884, at *5 (6th Cir. 1998) (unpublished) ("An employer is now essentially strictly liable for workplace harassment by supervisors unless it can establish the affirmative defense.").

Because strict liability is imposed on employers for the harassing conduct of their supervisors, there is an exception to liability for the employer: so long as the harassment did not result in a negative tangible employment action for the victim,[1] the employer has an available affirmative defense. To avail itself of the affirmative defense, the employer must show by a preponderance of the evidence that (a) "the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807-08 (1998); *see also Williams*, 187 F.3d at 561. The court below determined that UPS met this two-pronged affirmative defense to vicarious liability. As to the first prong, the court found that UPS took measures to prevent sexual harassment by maintaining a reasonable sexual harassment policy, making this policy widely available, and having regular training on the policy. Once UPS was made aware of Brock's

---

[1] If the victim did suffer some tangible employment action, such as a demotion, discharge, or undesirable transfer, then liability is automatic and the employer does not have the benefit of the affirmative defense. *See, e.g., Williams*, 187 F.3d at 561. Appellants do not allege any tangible employment actions in this case.

inappropriate behavior, through Robbins's investigation, UPS took corrective action immediately. Additionally, the court found that UPS met the second prong of the affirmative defense, because Clark and Knoop unreasonably failed to utilize any of the corrective opportunities provided by UPS's sexual harassment policy, such as complaining to a designated agent or calling the hotline to report incidents of harassment. As will be explained in more detail below, we disagree with the district court's conclusion that UPS is entitled to the affirmative defense at the summary judgment stage.

The affirmative defense encompasses active and inactive components: before the employer can benefit from the defense, it must prove both that it *acted* reasonably in preventing and correcting harassment and that the victimized employee unreasonably *failed to act* by not utilizing complaint opportunities. The employer will lose this defense if it fails either prong.

*1. Prong One of the Affirmative Defense: UPS's Duty to Reasonably Prevent and Promptly Correct Harassment*

Under the first prong of the defense, employers "have an *affirmative duty* to prevent sexual harassment by supervisors." *See Williams*, 187 F.3d at 561. "The law is clear that an employer may not stand by and allow an employee to be subjected to a course of racial and/or sexual harassment by co-workers or supervisors. Rather, once an employer has knowledge of the harassment, the law imposes upon the employer a duty to take reasonable steps to eliminate it." *Torres v. Pisano*, 116 F.3d 625, 636-37 (2d Cir. 1997) (internal quotation marks and citations omitted). Thus, regardless of whether the victimized employee actively complained, prong one of the defense ensures that an employer will not escape vicarious liability if it was aware of the harassment but did nothing to correct it or prevent it from occurring in the future. *See Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1014 (7th Cir. 1997) (stating that the "only chance to save [plaintiff's] claim (and send it to the jury) would be if [the employer] had reason to know of the harassment on its own"). While the affirmative duty on the part of the employer will often include the requirement that it have some sort of sexual harassment policy in place, the duty does not end there. Prong one of the affirmative defense requires an inquiry that looks behind the face of a policy to determine whether the policy was effective in practice in reasonably preventing and correcting any harassing behavior. *See Faragher*, 524 U.S. at 806 (stating that an employer may satisfy its burden if it has a "proven, effective mechanism for reporting and resolving" harassment); *Barna*, 1998 WL 939884, at *4 (finding that the inquiry under prong one is whether, upon having some notification of alleged harassment, the employer adequately investigated and responded to the situation). Thus, in determining whether UPS took reasonable care in preventing and promptly correcting the alleged sexual harassment in this case, we must look not only to UPS's sexual harassment policy, as the district court did, but also to its implementation of that policy.

While there is no exact formula for what constitutes a "reasonable" sexual harassment policy, an effective policy should at least: (1) require supervisors to report incidents of sexual harassment, *see Varner v. Nat'l Supermarkets, Inc.*, 94 F.3d 1209, 1214 (8th Cir. 1996); (2) permit both informal and formal complaints of harassment to be made, *Wilson v. Tulsa Junior Coll.*, 164 F.3d 534, 541 (10th Cir. 1998); (3) provide a mechanism for bypassing a harassing supervisor when making a complaint, *Faragher*, 524 U.S. at 808; and (4) and provide for training regarding the policy, *Wilson*, 164 F.3d at 541. As previously set forth, UPS's policy facially meets all of these requirements, and therefore on paper, as even the EEOC concedes in its amicus brief, UPS has a reasonable sexual harassment policy.

Nonetheless, the EEOC finds fault with UPS because UPS did not take preventative and corrective measures in response to Brock's misconduct. Appellants and the EEOC argue that none of the supervisors who witnessed Brock's behavior took any action towards stopping the harassment. If, prior to Robbins's investigation, UPS unreasonably failed to prevent and correct Brock's

harassing conduct, then UPS would not be able to satisfy prong one of the affirmative defense. *Faragher*, 524 U.S. at 805-06 (noting that the primary purpose of Title VII is not to provide redress for harassed employees, but to avoid the harm in the first place); *see also* 29 C.F.R. 1604.11(f) (cautioning employers to "take all steps necessary to prevent sexual harassment from occurring"). Thus, we must determine whether UPS's sexual harassment policy was effective in practice.

The effectiveness of an employer's sexual harassment policy depends upon the effectiveness of those who are designated to implement it. As an initial matter, appellees argue that the supervisors who witnessed Brock's behavior had no duty to take corrective or preventative action even if they did witness harassment by Brock, because none of them was his superior. The appellees argue that the low- to mid-level supervisors who witnessed the interactions between Brock, Clark, and Knoop had no duty to convey their knowledge to UPS, because these supervisors were not high enough in the company hierarchy and had no authority to control Brock. This argument might have merit but for the fact that UPS itself has, through its sexual harassment policy, placed a duty on *all* supervisors and managers to "report[] incidents of sexual harassment to the appropriate management people." *See Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1364 (11th Cir. 1999) (holding that when an employer designates certain employees as implementors of its policy, when those employees become aware of misconduct, the employer "has itself answered the question of when it would be deemed to have notice of the harassment sufficient to obligate it or its agents to take prompt and appropriate remedial measures"). Therefore, the supervisors at issue here were among those designated to implement the policy. Consequently, we must consider whether, as implementors of UPS's sexual harassment policy, the supervisors here acted reasonably – in response to what they observed – to prevent and correct sexual harassment.

In the instant case, Knoop alleges that supervisor Roller witnessed the "thong" incident of harassment by Brock. Clark alleges that supervisor West witnessed the "bag of chips" incident. She also claims that her supervisor, Riggons, witnessed Brock scratching the wall behind Clark's breasts, and may have heard the "cherries" comment made by Brock. Furthermore, the "wall scratching" incident, which was witnessed by Riggons, was followed by Clark asking Riggons "How does he get away with this[?] Why does this happen[?]" While it is unlikely that any of these individual incidents alone created a hostile workplace, there is a real question as to whether the supervisors should have taken the first step towards prevention and correction by reporting these incidents to the relevant UPS personnel, as was directed by the UPS policy. Thus, whether UPS, via these employees, exercised reasonable care is a question for a factfinder. *See McCombs v. Meijer, Inc.*, 395 F.3d 346, 355 (6th Cir. 2005) (finding that when an employer's response to potential harassment is legally sufficient to amount to indifference or unreasonableness, the question should go to a jury); *Smith v. First Union Nat. Bank*, 202 F.3d 234, 246 (4th Cir. 2000) (finding summary judgment inappropriate where the plaintiff presented evidence indicating that the employer's sexual harassment policy may have been dysfunctional in practice because such evidence created an issue of material fact as to whether the employer took reasonable care to prevent and correct harassment). Therefore, UPS cannot benefit from the affirmative defense at the summary judgment stage because it failed to show that there is no genuine issue of material fact regarding whether it exercised reasonable care in preventing and correcting harassment under prong one of the defense. Because UPS must prove both prong one and prong two of the defense to invoke it, we decline to decide whether UPS proved prong two by showing that Knoop and Clark unreasonably failed to take advantage of any complaint procedures. However, even if the UPS supervisors could be found to have unreasonably failed to report incidents of potential harassment, there is still a question as to whether Brock's conduct created a hostile work environment.

## 2. *Whether Brock's Conduct Created a Hostile Work Environment*

The Supreme Court has held that to maintain a hostile work environment claim, the victimized employee must show that under the totality of circumstances, the alleged conduct is

"sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Among the factors to be considered are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id*. at 23. The harassment should be ongoing, rather than a set of isolated or sporadic incidents. *Allen v. Mich. Dep't. of Corr.*, 165 F.3d 405, 411 (6th Cir. 1999). The plaintiff must show that the working environment was both objectively and subjectively hostile. *Harris*, 510 U.S. at 21-22.

Taking Knoop's allegations as true, the district court found that Brock's harassment of Knoop, while "distasteful and boorish, [] falls short of being sufficiently pervasive, hostile, or abusive to support a legal claim of a hostile work environment." We agree. Knoop alleged only three relatively isolated incidents over a period of approximately two and a half years. Knoop claims that Brock told vulgar jokes, that he twice placed his vibrating pager on her thigh as he passed her in the hall, and most significantly, he pulled at her overalls after she told him she was wearing a thong. While there is no bright line rule as to what constitutes a hostile work environment, the plaintiff's allegations must depict conduct that could be construed as pervasive enough to alter the conditions of her employment and to create an abusive situation. When Knoop's allegations are compared to other cases where the plaintiff showed the existence of a hostile workplace, it becomes clear that she has not made a prima facie showing of a hostile work environment. In *EEOC v. Harbert-Yeargin, Inc.*, 266 F.3d 498, 508-09 (6th Cir. 2001), we found that the plaintiff made a prima facie showing of a hostile workplace where a male supervisor grabbed a male employee's genitals on two separate occasions, stalked the employee several times a day, and where the employee's co-workers taunted him for making a harassment complaint. Likewise, in *Williams*, we found that a hostile work environment was shown when over four months, a male supervisor stared at the plaintiff's breasts and said "[y]ou can rub up against me anytime . . . you would kill me . . . I don't know if I can handle it, but I'd die with a smile on my face," came up behind her, put his arm around her neck and told her that she "left the dick out of the hand" when she wrote "Hancock Furniture Company," and came up behind her on another occasion while she was bending over and told her to back up into him. 187 F.3d at 562-64.

In contrast, a hostile work environment was not shown where, over a two month period, a male supervisor continuously made sexually suggestive comments about the female plaintiff's appearance, touched her breast as he removed and replaced a pen from her shirt pocket, leered at her, and told her that if he had someone like her, he would never let her leave the house. *See Stacy v. Shoney's, Inc.*, No. 97-5393, 1998 WL 165139, at *1-3 (6th Cir. 1998) (unpublished). The Seventh Circuit found that alleged harassment lacked severity where, over a two-year period, a male supervisor and co-workers, made sexual jokes about the plaintiff, commented on how she should eat a banana, told her not to wave at squad cars because people would think she was a prostitute, stared at her breasts, and touched her on the arms, fingers, and may have once poked at her buttocks. *Adusumilli v. City of Chicago*, 164 F.3d 353, 357 (7th Cir. 1998).

Although Knoop's allegations of harassment by Brock could certainly be construed as offensive, they are simply not substantial enough to satisfy the prima facie showing. Her claims depict isolated instances rather than an ongoing situation. Appellants retort that the harassment of Knoop was much more pervasive, relying on the fact that she had to listen to Brock tell the employees nasty jokes at least once a month. However the jokes that Brock told in Knoop's presence are not enough to elevate the isolated incidents to an ongoing and pervasive hostile environment. Title VII was not meant to create a "general civility code," and the "sporadic use of abusive language, gender-related jokes, and occasional teasing" are not sufficient to establish liability. *Faragher*, 524 U.S. at 788. Therefore, we AFFIRM the district court's conclusion that Knoop has failed to show that Brock's conduct towards her was severe and pervasive enough to create a hostile workplace.

Clark's allegations are similar in kind to Knoop's, however, she presents more of an ongoing pattern of unwanted conduct and attention by Brock. Clark presented seventeen incidents of harassment by Brock, including the incident where Brock tossed his vibrating pager between Clark's legs when she was sitting in her cubicle, and the "high-five" hand-grabbing incidents. *See infra*. The district court concluded that Clark presented a "closer case," and therefore chose not to determine whether she satisfied the hostile work environment threshold, as it did with Knoop. In light of the aforementioned case law on hostile work environment claims, the district court properly determined that Clark's allegations presented a closer case that should not be disposed of at the summary judgment stage. Consequently, because UPS is not entitled to the affirmative defense, we REVERSE the district court's grant of summary judgment to UPS with regards to Clark's claim.

## III. CONCLUSION

We hereby **AFFIRM** the grant of summary judgment to UPS as to Plaintiff-Appellant Rhonda Knoop, we **REVERSE** the grant of summary judgment to UPS as to Plaintiff-Appellant Sandra Clark, and we **REMAND** Clark's case to the district court for further proceedings consistent with this opinion.

---

### CONCURRING IN PART, DISSENTING IN PART

---

RALPH B. GUY, JR., Circuit Judge, concurring in part and dissenting in part.  I concur in Judge Cole's analysis as it pertains to plaintiff Knoop.  I respectfully dissent from the conclusion to reverse the summary judgment as to plaintiff Clark, however.  Although the alleged acts of harassment were more frequent in the case of Clark, I do not think they were sufficient to create a hostile work environment.

I would affirm the judgments entered by the district judge.