**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0989n.06

No. 10-4494

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*Sep 07, 2012*

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| CHASTITY SHIELDS | ) | |
| | ) | |
| Plaintiff, | ) | |
| and | ) | |
| | ) | |
| THEAH BARBER; MERCEDES DAVIS; | ) | |
| ANGELA WILLIAMS | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| Plaintiffs - Appellants | ) | SOUTHERN DISTRICT OF OHIO |
| | ) | |
| v. | ) | OPINION |
| | ) | |
| FEDERAL EXPRESS CUSTOMER | ) | |
| INFORMATION SERVICES | ) | |
| INCORPORATED; FEDERAL EXPRESS | ) | |
| CORPORATION | ) | |
| | ) | |
| Defendants - Appellees | ) | |

Before: SUHRHEINRICH, STRANCH, and DONALD, Circuit Judges.

JANE B. STRANCH, Circuit Judge. Theah Barber, Mercedes Davis, and Angela Williams

filed suit in Ohio state court against their employer, Federal Express Customer Information Services,

Inc. ("FCIS") alleging sexual harassment by their direct supervisor, Operations Manager James

Klingenberg, in violation of Ohio Rev. Code Ann. § 4112.02(A) (West 2009). FCIS removed the

action to federal court on the basis of diversity jurisdiction. Applying Title VII law, the district court

assumed the plaintiffs could establish a hostile work environment claim, but nonetheless granted

summary judgment in favor of FCIS. The court concluded as a matter of law that FCIS was entitled

1

to the affirmative defense to supervisor liability set forth in *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998), because FCIS maintained an effective sexual harassment policy and the plaintiffs unreasonably failed to follow the policy to report Klingenberg's harassment to FCIS. Because there are genuine issues of material fact on the applicability of the affirmative defense, we **REVERSE** and **REMAND** for trial.

## I. FACTS

FCIS employed Barber, Davis, Williams, and Chastity Shields as customer service representatives in a southwest Ohio call center.[1] The plaintiffs were assigned to a unit managed by Klingenberg, a long-time employee.

In January 2007, manager Robert Williams found a substantial number of inappropriate instant messages that Klingenberg sent to Shields on work computers between December 18, 2006, and early January 2007. Many of the messages contained overt sexual content. Williams provided copies of the messages to Harold Schmid, Klingenberg's direct supervisor. It appears that Schmid's office is not located at the call center, but Schmid visited the call center occasionally.

Upon receiving copies of Klingenberg's messages to Shields, Schmid consulted with Marianne Mutter, Managing Director, Eastern Region Customer Service in Pennsylvania; Deborah Baur, in the Human Resources department in Tennessee; and the company's legal department. Schmid suspended Klingenberg for three days with pay pending an investigation.

Schmid required Klingenberg to provide a written statement explaining his conduct. In a letter dated January 18, 2007, Klingenberg referred to his broken marriage of 24 years and stated that

---

[1]Although Shields is not a party to this appeal, the facts of her sexual harassment claim are pertinent to our analysis.

he became fond of Shields because she was appreciative of the many personal things he did for her. Klingenberg explained that Shields was the mother of three children living in different homes. During a fourth pregnancy she asked him for advice about whether to have an abortion. Although Klingenberg advised against the abortion, Shields had the procedure, but she then suffered guilt and attempted suicide. Klingenberg claimed that he served as Shields's counselor during this period. He warned her to use birth control and avoid sexually transmitted diseases, but not long thereafter, she became pregnant again and decided to have the baby. Shields purchased a small home against Klingenberg's advice. When she started having financial trouble, he told her he could not give her money, but he made some repairs to the house. He denied having a physical relationship with Shields. He said he felt sorry for her and tried to help her make better decisions. He conceded that he used poor judgment in sending the instant messages and asked for discipline short of termination.

Schmid did not discuss the contents of this statement with Klingenberg. No one interviewed Shields or asked Williams to examine Klingenberg's instant messages to see if he had sent any others to Shields before December 18, 2006. Schmid, Mutter, and Baur agreed that Klingenberg was likely having an affair with Shields due to the personal nature of the messages and because Shields had not filed a sexual harassment complaint under the company's Anti-Harassment Policy.

On January 24, 2007, Schmid issued an "Acceptable Conduct Warning" letter to Klingenberg for "Leadership Failure" and allowed him to continue in his managerial position supervising Shields and the other plaintiffs. In the warning letter, Schmid stated that Klingenberg's conduct in sending the instant messages to Shields violated the Acceptable Conduct Policy, the Computer Resources Policy, and the Anti-Harassment Policy. Schmid further stated that, "[b]y sending messages of a personal and suggestive nature to an employee who reports directly to you, you have exhibited poor

3

leadership, poor judgment and decision making skills, and you failed to demonstrate the highest degree of integrity, responsibility and professionalism required to be a leader." Schmid also stated: "Based on your past history, it is very important that you understand that any additional letters, while you are a manager in FCIS, will result in termination of your employment." Schmid modified the three-day paid suspension to a three-day unpaid suspension.

Klingenberg's past history, as documented in his personnel file, included a sexual harassment charge filed against him by another direct-report employee, Janelle Hocker, in September 1998. Hocker reported to management that Klingenberg inappropriately leaned into the back of her chair, touched her arms and legs and commented on her muscles, and, "after rejection," started scrutinizing her work more than the work of other employees. She alleged that he threatened to fire her on numerous occasions when there was no cause for disciplinary action. As a result of Hocker's complaint, Senior Customer Service Manager Chris Jones issued a "Counseling/Professionalism" letter to Klingenberg on February 23, 1999. Jones stated there was no evidence that sexual harassment had occurred, but he warned Klingenberg to avoid any action or conduct that might be viewed as sexual harassment. He also directed Klingenberg to have no future contact with Hocker except for business. Klingenberg's past history also included three other disciplinary writeups and one suspension for poor managerial behavior.

On January 30, 2007, six days after issuing the "Acceptable Conduct Warning" letter to Klingenberg for sending computer messages to Shields, Schmid completed Klingenberg's annual evaluation. Schmid awarded Klingenberg an overall rating of 3.4 out of 4 and evaluated his judgment and decision-making as "fully meeting expectations." Schmid added a comment that Klingenberg's conduct in sending instant messages violated the company's computer policy and

displayed "poor judgment," but Schmid did not make any reference to Klingenberg's violation of the Anti-Harassment Policy. In the rating section for employee selection, development, and affirmative action, including "development of minorities and females," Schmid rated Klingenberg as "outstanding." Schmid commented that Klingenberg's personal messages "to a direct report displayed a very serious lack of leadership and could have put our company in a tenuous situation," but Schmid added that Klingenberg "accepted total responsibility for his actions and dealt with the situation in an honest, open, and professional manner." There is no evidence that Schmid monitored Klingenberg's subsequent behavior.

In the fall of 2007, Schmid reorganized the call center and determined that it was a good time to move Shields to a different department so that she no longer reported directly to Klingenberg. Shields's new supervisor was Pam Frye. On November 14, 2007, Shields disclosed to Frye that Klingenberg had been sexually harassing her for months, and his conduct had escalated to the point that she feared him. Shields revealed that Klingenberg coerced her to allow him to suck her breasts in his office and in his car on threat of firing her if she did not comply, and he forced her to have sexual relations with him during a weekend vacation. Shields also reported that Klingenberg removed her from telephone duties by using codes for coaching time. He then directed her to his office where he expected sexual favors. Shields further divulged that Klingenberg showed up at her house uninvited on multiple occasions, and Shields knew that he watched her through the windows because he correctly told her the color of the undergarments she wore on a particular date. Klingenberg's voyeuristic behavior prompted Shields to install an alarm system at her home. She complained that Klingenberg sent sexual text messages to her personal cell phone during and after work hours, and he gave her notes and gifts. Shields urged Frye to speak to plaintiffs Barber and

5

Williams because Shields knew that Klingenberg had also made inappropriate sexual advances to them.

Frye approached Barber and Williams separately and asked if Klingenberg had ever done anything inappropriate to them. Both disclosed that he had made numerous sexual comments to them, touched them inappropriately, sent many sexual and vulgar text messages to their personal cell phones during and after work hours, and gave them sexual notes. Frye asked the women why they had not reported Klingenberg's conduct. Barber and Williams responded that they feared the loss of their jobs because Klingenberg had told them that if anyone ever found out about his conduct, he would do whatever it took to protect himself. He also threatened their employment by making comments that Wendy's or McDonald's was hiring. He also persuaded them that he was friends with the other call center managers and no one would believe them if they reported his behavior.

Barber knew that Klingenberg also sexually harassed Davis. Barber asked Davis for permission to disclose her name to Frye, and Davis agreed. Davis then divulged to Frye that Klingenberg had sexually harassed her as well. All three women disclosed to Frye the stress they suffered as a result of Klingenberg's conduct and how his behavior had adversely affected their work and private lives.

Frye provided EEO paperwork to the employees, which they completed the same day. Frye made copies of Klingenberg's text messages on the women's cell phones. Frye then notified her supervisor, Schmid, who in turn notified Mutter and Baur. Klingenberg left work on sick leave and began a medical leave of absence. Barber, Williams, and Davis did not see him at work again.

While Klingenberg was on medical leave, Mutter and Baur conducted an investigation into the plaintiffs' allegations of sexual harassment. Schmid was not included on the investigation team because one of the women mentioned in her EEO paperwork that Schmid was Klingenberg's friend.

At the conclusion of the medical leave, Schmid instructed Klingenberg to return to work on January 23, 2008, and report directly to a hotel to meet with Mutter and Baur, who would be waiting to receive his statement about his conduct. After Mutter and Baur received Klingenberg's response to the allegations, they told him to leave the hotel and return in a few hours. When he returned, Mutter terminated his employment.

Mutter issued two letters to Klingenberg on January 23, 2008. In the first one, Mutter placed Klingenberg on suspension with pay pending investigation of his violation of the Anti-Harassment Policy. In the second letter, Mutter issued an Acceptable Conduct Warning for leadership failure and terminated Klingenberg's employment.

## II. STANDARD OF REVIEW

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) & (c). The burden to show that there are no genuine issues of material fact falls upon FCIS as the party seeking summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). We consider the evidence presented in the light most favorable to the plaintiffs and draw all justifiable inferences in their favor. *Id.* The ultimate question is whether the evidence presents a sufficient factual

7

disagreement to require submission of a particular legal claim to the jury or whether the evidence on the claim is so one-sided that FCIS should prevail as a matter of law. *See id.* at 251-52.

## III. ANALYSIS

Ohio courts have held that "federal case law governing Title VII actions is generally applicable to cases involving alleged violations of" Ohio Rev. Code § 4112.02(A). *Williams v. Ford Motor Co.*, 187 F.3d 533, 538 (6th Cir. 1999). Consequently, we look to Title VII cases to guide our resolution of this appeal.

To make out a hostile work environment claim based on sexual harassment, each plaintiff must show that: (1) she was a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment created a hostile work environment; and (5) there is a basis for holding the employer liable. *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006). Although FCIS may dispute the plaintiffs' proof on all of these elements, in this appeal the focus is on employer liability: whether the plaintiffs can establish a basis on which to hold FCIS vicariously liable for the conduct of its supervisor, Klingenberg. *Clark v. UPS, Inc.*, 400 F.3d 341, 348 (6th Cir. 2005). FCIS contends that, because the plaintiffs did not suffer any negative tangible employment action, it is entitled to the *Faragher/Ellerth* affirmative defense, thus absolving it of liability for any sexual harassment Klingenberg may have committed. *See id.*

To prevail on the affirmative defense, FCIS must prove by a preponderance of the evidence that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and that the plaintiffs "unreasonably failed to take advantage of any preventive or corrective opportunities provided by [FCIS] or to avoid harm otherwise." *Faragher*, 524 U.S. at 807; *Ellerth*,

8

524 U.S. at 765. This defense requires FCIS to prove that it acted reasonably to prevent and correct harassment, *Clark*, 400 F.3d at 349, and because FCIS "is in the best position to know what remedial procedures it offers to employees and how those procedures operate," both *Faragher* and *Ellerth* "place the burden squarely on [FCIS] to prove that the plaintiff[s] unreasonably failed to avoid or reduce harm." *Pa. State Police v. Suders*, 542 U.S. 129, 146 & n.7 (2004). Contrary to the district court's rulings that FCIS "promulgated and enforced an effective sexual harassment policy," that FCIS used reasonable care to prevent further sexual harassment by Klingenberg, and that the plaintiffs unreasonably failed to take advantage of the sexual harassment policy, we conclude that there are genuine issues of material fact on both elements of the *Faragher/Ellerth* affirmative defense. Accordingly, we disagree with the district court's determination that FCIS is entitled to the affirmative defense as a matter of law at the summary judgment stage. *See Clark*, 400 F.3d at 349.

**A.     Whether FCIS used reasonable care to prevent and correct promptly sexually harassing conduct**

Employers are "subject to a strong inducement to ferret out and put a stop to any discriminatory activity in their operations as a way to break the circuit of imputed liability." *Crawford v. Metro. Gov't of Nashville and Davidson Cnty.*, 555 U.S. 271, 278 (2009). Under the first element of the affirmative defense, FCIS has a duty to prevent sexual harassment by its supervisors. *Clark*, 400 F.3d at 349. While reasonable sexual harassment policies may take many forms, we have held that an effective policy should at least require supervisors to report incidents of sexual harassment, allow employees to make both formal and informal complaints of harassment, provide a method for employees to bypass a harassing supervisor when making a complaint, and provide for training concerning the policy. *Id.* at 349–50.

9

The Anti-Harassment Policy promulgated by FCIS provides in pertinent part:

**Complaints**
If any employee believes that he or she has been subjected to harassment by anyone, including supervisors, . . . he or she must immediately report this to management or Human Resources. . . . Any member of management who receives a report or complaint of sexual or other harassment must immediately report the complaint to Human Resources even if the complaining employee asks that no action be taken. Any manager who fails to take action upon receiving a complaint of harassment may be subject to discipline, up to and including discharge.

Complaints of sexual or other illegal harassment will be treated as internal EEO complaints and follow the internal EEO procedure as outlined in 5-5 Fair and Impartial Review Procedure/EEO Complaint Process, Table 2, Internal EEO Discrimination or Harassment Complaint Procedure. All complaints will be promptly investigated in as confidential a manner as is possible while still conducting a thorough investigation.

R. 72-3, Page ID# 539. The policy further prohibits retaliation against any employee who reports sexual harassment or participates as a witness in a harassment investigation. *Id.*

We question whether FCIS's Anti-Harassment Policy facially satisfies all of the requirements of an effective policy that we previously set forth in *Clark*, 400 F.3d at 349–50. While the policy allows employees to make "reports" of harassment, it does not inform employees that their complaints may be informal and need not be placed in a formal writing. And while the language requiring a report to "management or Human Resources" conceivably permits employees to report harassing behavior of a supervisor to a higher level of management or to Human Resources, the policy does not expressly instruct the employees on any particular mechanism to bypass a harassing supervisor when making a complaint of harassment.

Even assuming the Anti-Harassment Policy satisfies *Clark*, however, FCIS's affirmative duty to prevent or correct sexually harassing behavior does not end with the promulgation of a reasonable sexual harassment policy. *See id.* at 349. The first element of the affirmative defense "requires an

10

inquiry that looks behind the face of a policy to determine whether the policy was effective in practice in reasonably preventing and correcting any harassing behavior." *Id.* We must consider not only the written policy, but also its implementation because a policy's efficacy "depends upon the effectiveness of those who are designated to implement it." *Id.* at 350.

The plaintiffs presented sufficient evidence to require a jury to decide whether FCIS effectively enforced its Anti-Harassment Policy to prevent or correct Klingenberg from sexually harassing women he supervised. Management received a formal, written complaint from employee Janelle Hocker in 1998 alleging that Klingenberg was sexually harassing her. Hocker's description of her supervisor's conduct is strikingly similar to the allegations made by these plaintiffs. Management responded to Hocker's complaint by issuing a letter to Klingenberg stating that no sexual harassment had occurred, but warning him to avoid any action or conduct that might be viewed as sexual harassment. Even if the company determined that there was insufficient evidence to sustain Hocker's charge of sexual harassment, "that does not mean that it had no responsibility to take other remedial steps to ensure that [Klingenberg] did not harass other women." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 344 (6th Cir. 2008). FCIS produced no evidence that it took steps to monitor Klingenberg's conduct after receiving Hocker's complaint or after disciplining Klingenberg for his "leadership failure" with regard to Shields. Both Barber and Williams testified that Klingenberg bragged to them that he had committed sexual harassment previously, but that "all [FCIS] did was transfer him to the call center." It is not clear whether Klingenberg's comment referred to Hocker or some other employee, but a jury could infer from this testimony that management was, or likely should have been, on notice that Klingenberg engaged in inappropriate conduct with female employees under his supervision.

11

A jury reviewing the evidence in this record could also reasonably find that, when Robert Williams discovered Klingenberg's instant messages to Shields in January 2007, Schmid, Mutter, and Baur—all of whom are members of management charged with implementing the Anti-Harassment Policy, *see Clark*, 400 F.3d at 350—should have conducted a more thorough investigation into Klingenberg's conduct. The sexual content of the messages, coupled with Klingenberg's own bizarre account of his relationship with Shields, may convince a jury to find that FCIS responded inadequately. Without even interviewing Shields, FCIS managers summarily concluded that Klingenberg and Shields were having a consensual affair. Schmid warned Klingenberg about "leadership failure" and suspended him for three days without pay. Schmid also allowed Klingenberg to continue managing Shields and other female employees without any apparent monitoring. Within days thereafter, Schmid issued a performance evaluation that rated Klingenberg's judgment and decision-making skills as fully meeting expectations. Whether these measures were reasonable, sufficient, and taken in good faith are matters for the jury to decide.

In addition, a jury hearing this evidence could find credible Barber's testimony that, if Schmid had done a more thorough investigation and interviewed Shields, then Shields likely would have disclosed Klingenberg's sexual harassment of the other women, just as Shields did months later when she approached Frye, and this would have given Barber "an outlet to tell somebody."[2] A jury could also believe Barber's testimony that when she asked Klingenberg why he had been suspended in January 2007, Klingenberg confessed that he sent sexual messages to another female employee's computer, but "thanks to Howard [Schmid] he didn't get fired," and he and Schmid "were cool, you

---

[2]FCIS contends that Barber's testimony is sheer speculation, as found by the district court. Whether the testimony amounts to speculation is for the jury to decide.

12

know, that was his buddy." Thus, the plaintiffs knew that Klingenberg had committed sexual harassment before and gotten away with it. As a result, a jury could accept their testimony that they had no confidence that reports to Schmid, Mutter, or Baur under FCIS's Anti-Harassment Policy would be effective to address Klingenberg's ongoing sexual harassment.

Because FCIS management knew that Klingenberg had been accused of sexual harassment before, FCIS could be held liable if a jury determines the company's response to Klingenberg's ongoing harassing conduct "demonstrate[d] an attitude of permissiveness" and was not "reasonably calculated to end [Klingenberg's] pattern of harassment." *Id.*; *Jackson v. Quanex Corp.*, 191 F.3d 647, 664 (6th Cir. 1999) (holding that reprimand of supervisor with history of discriminating against African Americans was not adequate by itself to prove that company took reasonable steps to prevent and correct harassment); *Hawkins*, 517 F.3d at 341 ("An employer's responsibility to prevent future harassment is heightened where it is dealing with a known serial harasser and is therefore on clear notice that the same employee has engaged in inappropriate behavior in the past."). On this record, a jury could well find that, had FCIS management performed a more comprehensive investigation in January 2007, management would have uncovered the sexual harassment of Shields, Barber, Williams, and Davis and terminated Klingenberg's employment sooner than it did. *See Hawkins*, 517 F.3d at 344 ("A company faced with a pattern of harassment must both respond appropriately and take increasingly effective steps designed to end the harassment.").

Based on the evidence before us, we conclude that FCIS "cannot benefit from the affirmative defense at the summary judgment stage because it failed to show that there is no genuine issue of material fact regarding whether it exercised reasonable care" to prevent and correct promptly any sexually harassing behavior. *See Clark*, 400 F.3d at 351; *Smith v. First Union Nat'l Bank*, 202 F.3d

13

234, 246 (4th Cir. 2000) (reversing summary judgment on Title VII sexual harassment claim where employer conducted inadequate investigation, failed to mention or discuss sexual harassment with the offender, and kept harassed employee working in close proximity to the offender).

**B.      Whether plaintiffs unreasonably failed to take advantage of preventive or corrective opportunities or to avoid harm otherwise**

The plaintiffs concede that they were aware of the Anti-Harassment Policy and that they did not initiate a report of sexual harassment to Human Resources.  They argue that they complied with the policy, however, because they complained directly to Klingenberg, a manager, and they asked him to stop his sexually harassing conduct.  This argument has some appeal due to the policy's general language that employees must make reports of sexual harassment "to management" and the policy's lack of any specific instruction to employees about how to bypass a harassing supervisor in making a report of sexual harassment.  But we have indicated that complaining directly to the harasser may not be sufficient to show compliance with an anti-harassment policy.  *See Balding-Margolis v. Cleveland Arcade*, 352 F. App'x 35,  44 (6th Cir. 2009) (affirming summary judgment where plaintiff testified "she never complained to anyone concerning Schultz's harassment . . . other than to Schultz himself.")  We have also observed that employees may not rely on their own subjective fear of confrontation, retaliation, or general unpleasantness in the workplace to avoid a duty under *Ellerth* to alert the employer to the hostile work environment, *Thornton v. Fed. Express Corp.*, 530 F.3d 451, 457 (6th Cir. 2008), nor may employees "pass their own judgments—absent supporting facts—about how effectively an employer's sexual harassment policies operate." *Idusuyi v. Tenn. Dep't of Children's Servs.*, 30 F. App'x 398, 404 (6th Cir. 2002).

14

Nonetheless, the *Faragher/Ellerth* defense should not be applied as a matter of law if circumstances suggest that there are questions of material fact for a jury to decide. *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93 (2d Cir. 2010). In *Gorzynski*, the employer, like FCIS, argued that it was unreasonable as a matter of law for the plaintiff not to take advantage of the alternative avenues provided in the harassment policy, including complaining to other members of management or the "People Department." *Id.* at 104. The Second Circuit rejected "such a brittle reading of the *Faragher/Ellerth* defense" reasoning:

> There is no requirement that a plaintiff exhaust all possible avenues made available where circumstances warrant the belief that some or all of those avenues would be ineffective or antagonistic. Considering the courage it takes to complain about what are often humiliating events and the understandable fear of retaliation that exists in many sexual harassment situations, we decline to read the rule so rigidly. Accordingly, we hold that an employer is not, as a matter of law, entitled to the *Faragher/Ellerth* defense simply because an employer's sexual harassment policy provides that the plaintiff could have complained to other persons as well as the alleged harasser. Instead, we conclude that the facts and circumstances of each case must be examined to determine whether, by not pursuing other avenues provided in the employer's sexual harassment policy, the plaintiff unreasonably failed to take advantage of the employer's preventative measures.

*Id.* at 104–05. In some situations, it may be unreasonable for a harassment victim to complain only to the harasser if, as a realistic and practical matter, there are other adequate channels that are open and accessible to the employee. *Id.* at 105. "But in other cases, there may be reasons why the plaintiff failed to complain to those other than the harasser, who are listed as available. And in such cases, a genuine issue of fact may be raised as to whether it was reasonable not to pursue other options." *Id.*

We find the Second Circuit's reasoning in *Gorzynski* instructive. All of the facts and circumstances must be evaluated to determine whether the plaintiffs unreasonably failed to take

15

advantage of FCIS's harassment policy. Moreover, our law permits an employee to avoid a policy requirement to initiate an internal company complaint about sexual harassment if the plaintiff can demonstrate that she was under a "'credible threat of retaliation.'" *Thornton*, 530 F.3d at 457 (quoting *Walton v. Johnson & Johnson Servs., Inc.*, 347 F.3d 1272, 1290–91 (11th Cir. 2003)). Considering all of the facts and circumstances, jury questions exist concerning whether other avenues for making complaints were available to the plaintiffs and whether they were under credible threats of retaliation.

According to the plaintiffs, Klingenberg told them repeatedly that the other managers located at the call center were his peers and social friends, so no one would believe them if they reported his conduct. The plaintiffs discussed Klingenberg's conduct among themselves, but they did not know which manager to approach because Klingenberg enjoyed close relationships with all of the other managers at the call center. They testified they did not feel comfortable contacting any of the managers. They also knew that none of the managers physically present at the call center had the authority to discipline or fire Klingenberg. A jury could give credence to the plaintiffs' beliefs that contacting Schmid would be futile because Klingenberg openly told them that Schmid was his "buddy" and protected his job when the instant messages to Shields were discovered. In addition, Mutter's office was located in Pennsylvania and Baur's office was located in Tennessee, so those two managers were not available for in-person consultation. The plaintiffs would have been required to obtain Klingenberg's permission to leave the customer service telephones in order to place complaint calls to higher management about his behavior. In light of these facts, it is the jury's role to decide whether the Anti-Harassment Policy required the plaintiffs to contact Mutter or Baur by telephone or email to complain about Klingenberg's behavior. We also conclude that whether the

16

plaintiffs held a reasonable belief that there was no one to tell, especially in light of the sexual harassment training they received, is a jury question.

The plaintiffs' testimony also tends to show that Klingenberg achieved their tacit agreement not to report his harassing conduct by making credible threats of retaliation against them. Klingenberg repeatedly threatened the plaintiffs' employment. For example, when Williams told Klingenberg that she intended to report his harassment, he replied, "It wouldn't be in your best interest; you wouldn't have a job." He reminded the plaintiffs that they would "look good as Wendy's cashiers" or that "McDonald's was hiring." The district court ruled as a matter of law that Klingenberg's comments about Wendy's or McDonald's were "too vague to constitute credible threats of retaliation." Yet, in denying summary judgment to FCIS in Shields's case, the district court observed that Klingenberg's similar comments to Shields amounted to positive evidence supporting her sexual harassment claim. There is no principled basis for giving Klingenberg's threats different weight in different cases. A reasonable jury could accept the plaintiffs' testimony that they interpreted Klingenberg's comments as credible threats of retaliation to keep them quiet. The plaintiffs also testified they honestly feared Klingenberg would retaliate against them through physical violence. He warned them that he would take any action necessary to protect himself if they revealed his conduct. They knew Shields installed an alarm system at her home after Klingenberg showed up there uninvited on multiple occasions and on at least one occasion peered through her windows. They knew that Klingenberg was the primary provider for his family, that he intended to retire from FCIS, and that there was a very strong probability that he would blame them if he lost his job. On the day the plaintiffs informed Frye of the sexual harassment and completed EEO paperwork, Klingenberg was furious. Although he left the office on medical leave, he retained

17

access to the office. Under the circumstances presented, a jury reasonably could find that the plaintiffs' safety concerns justified their failure to initiate complaints against Klingenberg.

Once Frye questioned the plaintiffs about Klingenberg, they immediately disclosed their reasons for not reporting his harassing conduct sooner pursuant to the sexual harassment policy. Frye included their explanations in her written report to Schmid. Mutter later documented similar explanations the plaintiffs gave to her and Baur during the investigation into Klingenberg's conduct that led to the termination of his employment. While we have held that it is not reasonable for employees to pass their own judgments about the operative effectiveness of an employer's sexual harassment policy "absent supporting facts," *see Idusuyi*, 30 F. App'x at 404, here, the plaintiffs presented supporting facts explaining why they believed the Anti-Harassment Policy would not be effectively enforced even if they disclosed the harassment. Under the facts of this case, it cannot be said as a matter of law that plaintiffs unreasonably failed to seek assistance under the Anti-Harassment Policy or to avoid the harm they suffered.

## IV. CONCLUSION

Because jury questions exist concerning whether FCIS exercised reasonable care to prevent and correct promptly any sexually harassing behavior of Klingenberg and whether the plaintiffs unreasonably failed to take advantage of any preventive or corrective opportunities provided by FCIS or to avoid harm otherwise, FCIS is not entitled to the benefit of the *Faragher/Ellerth* affirmative defense as a matter of law. We express no opinion on whether the plaintiffs will ultimately prevail on their hostile work environment claims—that is a matter for the jury. For the reasons stated, we **REVERSE** the grant of summary judgment in favor of FCIS and **REMAND** for trial.

18